# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 7, 2014          Decided April 14, 2014

No. 13-5252

NATIONAL ASSOCIATION OF MANUFACTURERS, ET AL.,
APPELLANTS

v.

SECURITIES AND EXCHANGE COMMISSION, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00635)

———

*Peter D. Keisler* argued the cause for appellants. With him on the briefs were *Jonathan F. Cohn*, *Erika L. Myers*, *Quentin Riegel*, *Rachel L. Brand*, and *Steven P. Lehotsky*.

*Eric P. Gotting* and *Eric G. Lasker* were on the brief for *amici curiae* American Chemistry Council, et al. in support of appellants.

*Eugene Scalia*, *Thomas M. Johnson Jr.*, *Harry M. Ng*, and *Peter C. Tolsdorf* were on the brief for *amicus curiae* American Petroleum Institute in support of appellants.

*John B. Bellinger III* and *Sarah M. Harris* were on the brief for *amicus curiae* Experts on the Democratic Republic of the Congo in support of petitioners.

*Mark T. Stancil* was on the brief for *amici curiae* Retail Litigation Center, Inc., et al. in support in appellants.

*Tracey A. Hardin*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for appellee. With her on the brief were *Michael A. Conley*, Deputy General Counsel, *Benjamin L. Schiffrin*, Senior Litigation Counsel, and *Daniel Staroselsky*, Senior Counsel.

*Julie A. Murray*, *Adina H. Rosenbaum*, and *Scott L. Nelson* were on the brief for intervenors-appellees Amnesty International USA, Inc., et al.

*Dennis M. Kelleher* and *Stephen W. Hall* were on the brief for *amicus curiae* Better Markets, Inc. in support of appellee.

*Agnieszka Fryszman* and *Thomas J. Saunders* were on the brief for *amici curiae* Senator Durbin, Congressman McDermott, et al. in support of appellee.

*Jodi Westbrook Flowers* was on the brief for *amici curiae* Global Witness, et al. in support of appellee.

Before: SRINIVASAN, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in part filed by *Circuit Judge* SRINIVASAN

RANDOLPH, *Senior Circuit Judge*:

## I.

For the last fifteen years, the Democratic Republic of the Congo has endured war and humanitarian catastrophe. Millions have perished, mostly civilians who died of starvation and disease. Communities have been displaced, rape is a weapon, and human rights violations are widespread.

Armed groups fighting the war finance their operations by exploiting the regional trade in several kinds of minerals. Those minerals—gold, tantalum, tin, and tungsten[1]—are extracted from technologically primitive mining sites in the remote eastern Congo. They are sold at regional trading houses, smelted nearby or abroad, and ultimately used to manufacture many different products.[2] Armed groups profit by extorting, and in some cases directly managing, the minimally regulated mining operations.

In 2010, Congress devised a response to the Congo war. Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (relevant parts codified at 15 U.S.C. §§ 78m(p), 78m note ('Conflict Minerals')), requires the Securities and Exchange Commission—the agency normally charged with policing America's financial markets—to issue regulations requiring

---

[1] *See* Conflict Minerals, 77 Fed. Reg. 56,274, 56,284-85 (Sept. 12, 2012).

[2] For example, tantalum is used in turbines, camera lenses, medical devices, cell phones, and computers. Tin is used in plastics, phones, and automobile parts. Tungsten is used in lighting, power tools, and golf clubs.

firms using "conflict minerals" to investigate and disclose the origin of those minerals. *See* 15 U.S.C. § 78m(p)(1)(A).

The disclosure regime applies only to "person[s] described" in the Act. *See id.* A "person is described . . . [if] conflict minerals are necessary to the functionality or production of a product manufactured by such person." *Id.* § 78m(p)(2). A described person must "disclose annually, whether [its necessary] conflict minerals . . . did originate in the [Congo] or an adjoining country." *Id.* § 78m(p)(1)(A). If those minerals "did originate" in the Congo or an adjoining country (collectively, "covered countries") then the person must "submit [a report] to the Commission." *Id.* The report must describe the "due diligence" measures taken to establish "the source and chain of custody" of the minerals, including a "private sector audit" of the report. *Id.* The report must also list "the products manufactured or contracted to be manufactured that are not DRC conflict free." *Id.* A product is "DRC conflict free" if its necessary conflict minerals did not "directly or indirectly finance or benefit armed groups" in the covered countries. *Id.*

In late 2010, the Commission proposed rules for implementing the Act. Conflict Minerals, 75 Fed. Reg. 80,948 (Dec. 23, 2010). Along with the proposed rules, the Commission solicited comments on a range of issues. In response, it received hundreds of individual comments and thousands of form letters. Conflict Minerals, 77 Fed. Reg. 56,274, 56,277-78 (Sept. 12, 2012) ("final rule") (codified at 17 C.F.R. §§ 240.13p-1, 249b.400). The Commission twice extended the comment period and held a roundtable for interested stakeholders. *Id.* By a 3-2 vote, it promulgated the final rule, which became effective November 13, 2012. *Id.* at 56,274. The first reports are due by May 31, 2014. *Id.*

The final rule adopts a three-step process, which we outline below, omitting some details not pertinent to this appeal. At step

one, a firm must determine if the rule covers it. *Id.* at 56,279, 56,285. The final rule applies only to securities issuers who file reports with the Commission under sections 13(a) or 15(d) of the Exchange Act. *Id.* at 56,287. The rule excludes issuers if conflict minerals are not necessary to the production or functionality of their products. *Id.* at 56,297-98. The final rule does not, however, include a *de minimis* exception, and thus applies to issuers who use very small amounts of conflict minerals. *Id.* at 56,298. The rule also extends to issuers who only contract for the manufacture of products with conflict minerals, as well as issuers who directly manufacture those products. *Id.* at 56,290-92.

Step two requires an issuer subject to the rule to conduct a "reasonable country of origin inquiry." *Id.* at 56,311. The inquiry is a preliminary investigation reasonably designed to determine whether an issuer's necessary conflict minerals originated in covered countries. *Id.* at 56,312. If, as a result of the inquiry, an issuer either knows that its necessary conflict minerals originated in covered countries or "has reason to believe" that those minerals "may have originated" in covered countries, then it must proceed to step three and exercise due diligence. *Id.* at 56,313.[3]

An issuer who proceeds to step three must "exercise due diligence on the source and chain of custody of its conflict minerals." *Id.* at 56,320. If, after performing due diligence an

---

[3] If the inquiry discloses that there is *no* reason to believe the issuer's conflict minerals came from covered countries or that there is a reasonable basis for believing that the issuer's conflict minerals came from scrap or recycled sources, then the issuer need only file a specialized disclosure report on the newly-created Form SD, briefly describing its inquiry, 77 Fed. Reg. at 56,313, and provide a link to the report on its website. *Id.* at 56,315. No due diligence is required.

issuer still has reason to believe its conflict minerals may have originated in covered countries, it must file a conflict minerals report. The report must describe both its due diligence efforts, including a private sector audit,[4] *id.*, and those products that have "not been found to be 'DRC conflict free,'" *id.* at 56,322 (quoting 15 U.S.C. § 78m(p)(1)(A)(ii)). The report must also provide detailed information about the origin of the minerals used in those products. *Id.* at 56,320.

The final rule does offer a temporary reprieve. During a two-year phase-in period (four years for smaller issuers), issuers may describe certain products as "DRC conflict undeterminable" instead of conflict-free or not conflict-free. *Id.* at 56,321-22. That option is available only if the issuer cannot determine through due diligence whether its conflict minerals originated in covered countries, or whether its minerals benefitted armed groups. *Id.* An issuer taking advantage of the phase-in by describing its products as "DRC conflict undeterminable" must still perform due diligence and file a conflict minerals report, but it need not obtain a private sector audit. *Id.*

The Commission analyzed in some detail the final rule's costs. *Id.* at 56,333-54. It estimated the total costs of the final rule would be $3 billion to $4 billion initially, and $207 million to $609 million annually thereafter. *Id.* at 56,334. To come up with this estimate, the Commission reviewed four cost estimates it received during the comment period, supplemented with its own data. *Id.* at 56,350-54. Where possible, the Commission

---

[4] To be precise, an issuer must also submit a conflict minerals report if, as a result of its earlier inquiry, it *knows* that its conflict minerals came from covered countries. 77 Fed. Reg. at 56,320. That issuer must still perform due diligence, but the trigger for the report is the preliminary inquiry, not the due diligence results.

also estimated or described the marginal costs of its significant discretionary choices. *Id.* at 56,342-50.

The Commission was "unable to readily quantify" the "compelling social benefits" the rule was supposed to achieve: reducing violence and promoting peace and stability in the Congo. *Id.* at 56,350. Lacking quantitative data on those issues, the Commission explained that it could not "assess how effective" the rule would be in achieving any benefits. *Id.* Instead, the Commission relied on Congress's judgment that supply-chain transparency would promote peace and stability by reducing the flow of money to armed groups. *Id.* at 56,275-76, 56,350. That judgment grounded many of the Commission's discretionary choices in favor of greater transparency. *See, e.g.*, *id.* at 56,288, 56,291, 56,298.

The National Association of Manufacturers challenged the final rule, raising Administrative Procedure Act, Exchange Act, and First Amendment claims.[5] The district court rejected all of the Association's claims and granted summary judgment for the Commission and intervenor Amnesty International. *See Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43, 46 (D.D.C. 2013).

## II.

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action . . . found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[, or] in excess of statutory jurisdiction." 5

---

[5] The Association initially filed a petition for review in this court. After our opinion in *American Petroleum Institute v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013), the Association moved to transfer the case to the district court, and we granted the motion. *See* Per Curiam Order, *Nat'l Ass'n of Mfrs. v. SEC*, No. 12-1422 (D.C. Cir. May 2, 2013).

U.S.C. § 706(2). In making these determinations, we review the administrative record as if the case had come directly to us without first passing through the district court. *See Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

**A.**

The Act does not include an exception for *de minimis* uses of conflict minerals. The Association claims that the rule should have included a *de minimis* exception and that the Commission erred when, during the rulemaking, it failed to recognize its authority to create one and assumed that the statute foreclosed any exception.

Although the Commission acknowledges that it had the authority to create such an exception, *see, e.g.*, 15 U.S.C. § 78mm(a)(1); *Ala. Power Co. v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979), it stated during the rulemaking that a *de minimis* exception "would be contrary to the [statute] and Congressional purpose," and that if Congress intended to include such an exception it "would have done so explicitly" as it did in a nearby section of Dodd-Frank. 77 Fed. Reg. at 56,298. But we do not interpret that explanation the way the Association does. Read in context, the Commission's language addressed the general purpose of the statute and the effects of its policy choices. Congress knew that conflict minerals are often used in very small quantities. The Commission, relying on text, context, and policy concerns, inferred that Congress wanted the disclosure regime to work even for those small uses. *Id.* A *de minimis* exception would, in the Commission's judgment, "thwart" that goal. *Id.*

The Commission's explanation was thus a far cry from a mere "parsing of the statutory language," *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d

786, 797 (D.C. Cir. 2004)), that has caused us to set aside agency action in other cases. *See, e.g.*, *id.* at 1353 (statute's "plain language" "does not permit" action); *Arizona v. Thompson*, 281 F.3d 248, 253-54 (D.C. Cir. 2002) ("intent of Congress, rather than of HHS" "does not permit" action); *Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1068 (D.C. Cir. 1997) ("plain meaning" of a statute was "unambiguous"). Nothing in the Commission's explanation suggests, as in those cases, that the statutory text by itself foreclosed any exception. Rather, the explanation "looks to be a quite ordinary construction of a statute over which the agency has been given interpretive authority." *PDK Labs.*, 362 F.3d at 807-08 (Roberts, J., concurring in part and concurring in the judgment).

The Commission did not act arbitrarily and capriciously by choosing not to include a *de minimis* exception. Because conflict minerals "are often used in products in very limited quantities," the Commission reasoned that "a de minimis threshold could have a significant impact on the final rule." 77 Fed. Reg. at 56,298 (quoting U.S. Dep't of State Responses to Request for Comment). The Association suggests that this rationale would not apply to *de minimis* thresholds measured by mineral use per-issuer, instead of per-product. Although that sort of threshold was *suggested* in a few comments, those comments did not explain the merits of the proposal or compare it to other thresholds. The Commission was not obligated to respond to those sorts of comments. *See Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Alianza Fed. de Mercedes v. FCC*, 539 F.2d 732, 739 (D.C. Cir. 1976). In any event, the Commission's rationale still applies to a per-issuer exemption. Having established that conflict minerals are frequently used in minute amounts, the Commission could reasonably decide that a per-issuer exception could "thwart" the statute's goals by leaving unmonitored small quantities of minerals aggregated over many issuers. Though costly, that decision bears a "rational

connection" to the facts. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**B.**

As we have mentioned, the final rule requires an issuer to conduct "due diligence" if, after its inquiry, it "has *reason to believe* that its necessary conflict minerals *may have originated* in" covered countries. 77 Fed. Reg. at 56,313 (emphasis added). According to the Association, that requirement contravenes the statute, which requires issuers to "submit to the Commission a report" only "in cases in which [their] conflict minerals *did originate*" in covered countries. 15 U.S.C. § 78m(p)(1)(A) (emphasis added).

The Association has conflated distinct issues. The statute does require a conflict minerals report if an issuer has already performed due diligence and determined that its conflict minerals did originate in covered countries. But the statute does not say in what circumstances an issuer must perform due diligence before filing a report. The statute also does not list what, if any, reporting obligations may be imposed on issuers uncertain about the origin of their conflict minerals.

In general, if a statute "is silent or ambiguous with respect to the specific issue at hand" then "the Commission may exercise its reasonable discretion in construing the statute." *Bldg. Owners & Managers Ass'n Int'l v. FCC*, 254 F.3d 89, 93-94 (D.C. Cir. 2001) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984)). And that discretion may be exercised to regulate circumstances or parties beyond those explicated in a statute. *See, e.g.*, *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 371-73 (1973); *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991). Here, the statute is silent with respect to both a threshold for conducting due diligence, and the obligations of uncertain issuers. The

Commission used its delegated authority to fill those gaps, and nothing in the statute foreclosed it from doing so.[6]

We also reject the Association's argument that the Commission's due diligence threshold was arbitrary and capricious. The Commission adopted a lower due diligence threshold to prevent issuers from "ignor[ing] . . . warning signs" that their conflict minerals originated in covered countries. 77 Fed. Reg. at 56,313. In particular, the Commission wanted issuers who encounter red flags to "learn[] the ultimate source" of their conflict minerals. *Id*. at 56,314. Requiring a good-faith inquiry does not resolve the Commission's concerns. A good-faith inquiry could generate red flags but, without a further due diligence requirement, those red flags would not give way to "ultimate" answers, which result would "undermine the goals of the statute." *Id.*

Although the Commission adopted an expansive rule, it did not go as far as it might have, and it declined to require due diligence by issuers who encounter no red flags in their inquiry. *Id.* By doing so, the Commission reduced the costs of the final rule, and resolved the Association's concern that the rule will yield a flood of trivial information. *Id.*

---

[6] The parties also disagree over a more subtle point. The Association concedes that due diligence can be required if an issuer has "reason to believe" its conflict minerals "did" originate in covered countries. *See* Oral Arg. Tr. at 4:14-5:16. Since "reason to believe" inherently conveys uncertainty, it is unclear how that standard would differ in practice from the Commission's "reason to believe . . . may" standard. Because the statute is ambiguous we need not resolve the issue.

12

## C.

By its terms, the statute applies to "Persons Described," or those that "manufacture[]" a product in which conflict minerals "are necessary to the functionality or production" of the product. 15 U.S.C. § 78m(p)(2). If those persons file a conflict minerals report the statute requires them to describe products they "manufacture[] or contract[] to be manufactured." *Id.* § 78m(p)(1)(A)(i). The Commission reconciled these provisions in an expansive fashion, applying the final rule not only to issuers that manufacture their own products, but also to those that only contract to manufacture. 77 Fed. Reg. at 56,290-91. The Association claims that decision violates the statute. By using the phrase "contracted to be manufactured" in one provision, but only "manufactured" in another, Congress allegedly intended to limit the scope of the latter.

The persons-described provision, though it refers expressly to manufacturers, is silent on the obligations of issuers that only contract for their goods to be manufactured. Standing alone, that silence allows the Commission to use its delegated authority in determining the rule's scope, just as with the due diligence provision. The Association's argument is no more persuasive here because Congress explicitly used the phrase "contracted to be manufactured" in a nearby provision.

The Association invokes the canon *expressio unius est exclusio alterius*. But that canon is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R. Co., Inc. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990); *see Tex. Rural Legal Aid*, 940 F.2d at 694. The more reasonable interpretation of the statute as a whole is that Congress simply "deci[ded] not to mandate any solution" and left the rule's application to contractors "to agency discretion." *Cheney R. Co.*, 902 F.2d at 69 (emphasis omitted).

Potential "internal[] inconsisten[cy]" between the due diligence and persons-described provisions also persuades us that the statute is ambiguous. *See* 77 Fed. Reg. at 56,291. An issuer subject to the rule must describe due diligence measures it undertakes on the source and chain of custody of "such minerals." 15 U.S.C. § 78m(p)(1)(A)(i). "[S]uch minerals" refers, in the preceding paragraph, to "minerals that are necessary as described in paragraph (2)(B)." *Id.* § 78m(p)(1)(A). Paragraph (2)(B) in turn refers to minerals "necessary to . . . a product *manufactured*" by a person described. *Id.* § 78m(p)(2) (emphasis added). Thus, under the Association's reading, an issuer would not have to describe its due diligence efforts (or even, presumably, to conduct due diligence) for products it does not manufacture. And yet, the statute requires that same issuer to describe its contracted-for products as not conflict free under § 78m(p)(1)(A)(ii) if they do not meet the statute's definition. We do not understand how an issuer could describe its contracted-for products without first conducting due diligence on those products, or why the statute would require certain products to be described in a report without a corresponding explanation of the related due diligence efforts. The Commission's interpretation is therefore reasonable because it reconciles otherwise confusing and conflicting provisions "into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation omitted).

The Commission did not erroneously assume that its interpretation was compelled by Congress. As the district court explained, referring once to Congress's intent as "clear" does not establish that the Commission believed it lacked discretion. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 72 (quoting *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 445 (D.C. Cir. 2012)). The balance of the Commission's explanation, as with the *de minimis* exception, falls well short of the language on which we have relied to set aside agency action. *See supra* at 8-9. Rather than merely parsing the statutory

language, the Commission provided policy justifications and structural inferences supporting its decision. 77 Fed. Reg. at 56,291.

Nor did the Commission act arbitrarily or capriciously. The final rule applies to contractors so that issuers cannot "avoid [its] requirements by contracting out of the manufacture" of their products. *Id.* at 56,291. The Association thinks the final rule reaches too far and overstates the risk of circumvention. But that is a question of judgment for the Commission, which we will not second-guess. The Commission's explanation was "rational," and that is enough. *State Farm*, 463 U.S. at 43.

**D.**

The final rule's temporary phase-in period allows issuers to describe certain products as "DRC conflict undeterminable" and to avoid conducting an audit. 77 Fed. Reg. at 56,320-21. The Association claims the length of the phase-in—two years for large issuers and four years for small issuers—is inconsistent, arbitrary, and capricious because small issuers are part of large-issuer supply chains. All issuers, the Association says, will therefore face the same information problems. Not so. Large issuers, the Commission explained, can exert greater leverage to obtain information about their conflict minerals, *id.* at 56,322-23, and they may be able to exercise that leverage indirectly on behalf of small issuers in their supply chains. *Id.* at 56,323 n.570. Like the district court, we can "see the trickledown logic underlying the Commission's approach," even if it does not hold in all cases. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73 n.24.

15

**III.**

Two provisions require the Commission to analyze the effects of its rules. Under 15 U.S.C. § 78w(a)(2), the Commission "shall not adopt any rule [under § 78m(p)] . . . which would impose a burden on competition not necessary or appropriate" to advance the purposes of securities laws. Also, when the Commission "is engaged in rulemaking," it must "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f). The Association, citing several of our recent opinions, alleges that the Commission violated those sections because it did not adequately analyze the costs and benefits of the final rule. *See Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011); *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).[7]

We do not see any problems with the Commission's cost-side analysis. The Commission exhaustively analyzed the final rule's costs. *See* 77 Fed. Reg. at 56,333-54. It considered its own data as well as cost estimates submitted during the comment period, *id.* at 56,350-54, and arrived at a large bottom-line figure that the Association does not challenge. *Id.* at 56,334. The Commission specifically considered the issues listed in § 78c(f) and concluded that the rule would impose competitive costs, but have relatively minor or offsetting effects on efficiency and capital formation. 77 Fed. Reg. at 56,350-51. The Association does not dispute those conclusions.

---

[7] Dodd-Frank independently requires the Comptroller General of the United States to submit annual reports to Congress "assess[ing ] the effectiveness of . . . 15 U.S.C. 78m(p) in promoting peace and security in the" covered countries. 15 U.S.C. § 78m note ('Conflict Minerals').

Instead, the Association argues on the benefit side that the Commission failed to determine whether the final rule would actually achieve its intended purpose. But we find it difficult to see what the Commission could have done better. The Commission determined that Congress intended the rule to achieve "compelling social benefits," *id.* at 56,350, but it was "unable to readily quantify" those benefits because it lacked data about the rule's effects. *Id.*

That determination was reasonable. An agency is not required "to measure the immeasurable," and need not conduct a "rigorous, quantitative economic analysis" unless the statute explicitly directs it to do so. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013) (internal quotation marks omitted); *see Chamber of Commerce*, 412 F.3d at 360. Here, the rule's benefits would occur half-a-world away in the midst of an opaque conflict about which little reliable information exists, and concern a subject about which the Commission has no particular expertise. Even if one could estimate how many lives are saved or rapes prevented as a direct result of the final rule, doing so would be pointless because the costs of the rule—measured in dollars—would create an apples-to-bricks comparison.

Despite the lack of data, the Commission *had* to promulgate a disclosure rule. 15 U.S.C. § 78m(p)(1)(A). Thus, it relied on Congress's "determin[ation] that [the rule's] costs were necessary and appropriate in furthering the goals" of peace and security in the Congo. 77 Fed. Reg. at 56,350. The Association responds that the Commission only had to adopt some disclosure rule; Congress never decided the merits of the Commission's discretionary choices. True enough. But Congress did conclude, as a general matter, that transparency and disclosure would benefit the Congo. *See* 15 U.S.C. § 78m note. And the Commission invoked that general principle to justify each of its discretionary choices. *See id.* at 56,291; (contractors to

manufacture); *id.* at 56,298 (no *de minimis* exception); *id.* at 56,313-14 (due diligence standard); *id.* at 56,322 (phase-in).

What the Commission did not do, despite many comments suggesting it, was question the basic premise that a disclosure regime would help promote peace and stability in the Congo. If the Commission second-guessed Congress on that issue, then it would have been in an impossible position. If the Commission had found that disclosure would fail of its essential purpose, then it could not have adopted *any* rule under the Association's view of §§ 78w(a)(2) and 78c(f). But promulgating some rule is exactly what Dodd-Frank required the Commission to do.

**IV.**

This brings us to the Association's First Amendment claim. The Association challenges only the requirement that an issuer describe its products as not "DRC conflict free" in the report it files with the Commission and must post on its website.[8] 15 U.S.C. § 78m(p)(1)(A)(ii) & (E). That requirement, according to the Association, unconstitutionally compels speech. The district court, applying *Central Hudson Gas & Electric Corp. v.*

---

[8] The district court stated that the Association had limited its First Amendment claim to product descriptions on an issuer's "website[]." *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73. In this court both the Commission and the intervenor Amnesty International understood the Association's claim to encompass also the not "DRC conflict free" statement required in a company's report to the Commission. *See, e.g.*, Appellee Br. 58, 61; Intervenor Br. 31. When asked about the scope of the claim during oral argument, counsel for the Association clarified that the First Amendment claim also extends to labeling of products as not conflict free in reports to the Commission. Oral Arg. Tr. at 15:25-16:11. The Association does not have any First Amendment objection to any other aspect of the conflict minerals report or required disclosures. *Id.* at 16:11-16:25.

*Public Service Commission*, 447 U.S. 557, 564-66 (1980), rejected the First Amendment claim. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 73, 75-82. We review its decision *de novo. Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 737 (D.C. Cir. 2011).[9]

The Commission argues that rational basis review is appropriate because the conflict free label discloses purely factual non-ideological information. We disagree. Rational basis review is the exception, not the rule, in First Amendment cases. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). The Supreme Court has stated that rational basis review applies to certain disclosures of "purely factual and uncontroversial information." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). But as intervenor Amnesty International forthrightly recognizes,[10] we have held that

---

[9] The concurring opinion suggests that we hold the First Amendment portion of our opinion in abeyance and stay implementation of the relevant part of the final rule. We do not see why that approach is preferable, even though it might address the risk of irreparable First Amendment harm. Issuing an opinion now provides an opportunity for the parties in this case to participate in the court's *en banc* consideration of this important First Amendment question. That is consistent with the court's previous approach in *United States v. Crowder*, 87 F.3d 1405, 1409 (D.C. Cir. 1996) (en banc), *cert. granted, judgment vacated*, 519 U.S. 1087 (1997), *on remand* 141 F.3d 1202 (D.C. Cir. 1998) (en banc), in which we consolidated two cases presenting the same legal issue so that all parties could participate in the *en banc* proceeding.

[10] *See* Intervenor Br. 32 n.5 ("Amnesty International recognizes that this panel is bound by *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), which circumscribed *Zauderer*'s rational-basis standard."). For its part, the Commission makes no attempt to distinguish *R.J. Reynolds*; in fact, it does not even acknowledge the holding of *R.J. Reynolds* regarding *Zauderer*, which the Commission also fails to cite.

*Zauderer* is "limited to cases in which disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.'" *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1213 (D.C. Cir. 2012) (quoting *Zauderer*, 471 U.S. at 651); *see Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.18 (D.C. Cir. 2013). *But see Am. Meat Inst. v. USDA*, No. 13-5281, 2014 WL 1257959, at *4-7 (D.C. Cir. Mar. 28, 2014), *vacated and en banc rehearing ordered*, Order, No. 13-5281 (D.C. Cir. Apr. 4, 2014) (en banc). No party has suggested that the conflict minerals rule is related to preventing consumer deception. In the district court the Commission admitted that it was not. *Nat'l Ass'n of Mfrs.*, 956 F. Supp. 2d at 77.

That a disclosure is factual, standing alone, does not immunize it from scrutiny because "[t]he right against compelled speech is not, and cannot be, restricted to ideological messages." *Nat'l Ass'n of Mfrs.*, 717 F.3d at 957. Rather, "th[e] general rule, that the speaker has the right to tailor the speech, applies . . . equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573-74 (1995) (citing cases). As the Supreme Court put it in *Riley v. National Federation of the Blind of North Carolina, Inc.*, the cases dealing with ideological messages[11] "cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact.'" 487 U.S. 781, 797 (1988).

---

[11] *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705 (1977); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("Some of [the] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say.").

At all events, it is far from clear that the description at issue—whether a product is "conflict free"—is factual and non-ideological. Products and minerals do not fight conflicts. The label "conflict free" is a metaphor that conveys moral responsibility for the Congo war. It requires an issuer to tell consumers that its products are ethically tainted, even if they only indirectly finance armed groups. An issuer, including an issuer who condemns the atrocities of the Congo war in the strongest terms, may disagree with that assessment of its moral responsibility. And it may convey that "message" through "silence." *See Hurley*, 515 U.S. at 573. By compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment. *See id.*

Citing our opinion in *SEC v. Wall Street Publishing Institute, Inc.*, intervenor Amnesty International argues that rational basis review applies because the final rule exercises "the federal government's broad powers to regulate the securities industry." 851 F.2d 365, 372 (D.C. Cir. 1988).[12] In *Wall Street Publishing* the court held that the Commission could, without running afoul of the First Amendment, seek an injunction requiring that a magazine disclose the consideration it received in exchange for stock recommendations. *Id*. at 366. Significantly, the court chose to apply a less exacting level of scrutiny, even though the injunction did not fall within any well-established exceptions to strict scrutiny. *Id.* at 372-73.

It is not entirely clear what would result if *Wall Street Publishing* did apply to this case. The opinion never states that rational basis review governs securities regulations as such. At one point, the opinion even suggests that the power to regulate

---

[12] The Commission does not join this argument.

securities might be roughly tantamount to the government's more general power to regulate commercial speech. *Id.* at 373.

Whatever its consequences, we do not think *Wall Street Publishing* applies here. The injunction at issue there regulated "inherently misleading" speech "employed . . . to sell securities." *Id.* at 371, 373. The opinion thus concerned the same consumer-deception rationale as did *Zauderer*. *See id.* at 374. As explained above, consumer-deception is not an issue here, and the "conflict free" label is not employed to sell securities.

To read *Wall Street Publishing* broadly would allow Congress to easily regulate otherwise protected speech using the guise of securities laws. Why, for example, could Congress not require issuers to disclose the labor conditions of their factories abroad or the political ideologies of their board members, as part of their annual reports? Those examples, obviously repugnant to the First Amendment, should not face relaxed review just because Congress used the "securities" label.

Having established that rational basis review does not apply, we do not decide whether to use strict scrutiny or the *Central Hudson* test for commercial speech. That is because the final rule does not survive even *Central Hudson*'s intermediate standard.

Under *Central Hudson*, the government must show (1) a substantial government interest that is; (2) directly and materially advanced by the restriction; and (3) that the restriction is narrowly tailored. 447 U.S. at 564-66; *see R.J. Reynolds*, 696 F.3d at 445. The narrow tailoring requirement invalidates regulations for which "narrower restrictions on expression would serve [the government's] interest as well." *Cent. Hudson*, 447 U.S. at 565. Although the government need not choose the "least restrictive means" of achieving its goals, there must be a "reasonable" "fit" between means and ends. *Bd.*

*of Trs. v. Fox*, 492 U.S. 469, 480 (1989). The government cannot satisfy that standard if it presents no evidence that less restrictive means would fail. *Sable Commc'ns v. FCC*, 492 U.S. 115, 128-32 (1989).

The Commission has provided no such evidence here. The Association suggests that rather than the "conflict free" description the statute and rule require, issuers could use their own language to describe their products, or the government could compile its own list of products that it believes are affiliated with the Congo war, based on information the issuers submit to the Commission. The Commission and Amnesty International simply assert that those proposals would be less effective. But if issuers can determine the conflict status of their products from due diligence, then surely the Commission can use the same information to make the same determination. And a centralized list compiled by the Commission in one place may even be more convenient or trustworthy to investors and consumers. The Commission has failed to explain why (much less provide evidence that) the Association's intuitive alternatives to regulating speech would be any less effective.

The Commission maintains that the fit here is reasonable because the rule's impact is minimal. Specifically, the Commission argues that issuers can explain the meaning of "conflict free" in their own terms. But the right to explain compelled speech is present in almost every such case and is inadequate to cure a First Amendment violation. *See Nat'l Ass'n of Mfrs.*, 717 F.3d at 958. Even if the option to explain minimizes the First Amendment harm, it does not eliminate it completely. Without any evidence that alternatives would be

less effective, we still cannot say that the restriction here is narrowly tailored.[13]

We therefore hold that 15 U.S.C. § 78m(p)(1)(A)(ii) & (E), and the Commission's final rule, 77 Fed. Reg. at 56,362-65, violate the First Amendment to the extent the statute and rule require regulated entities to report to the Commission and to state on their website that any of their products have "not been found to be 'DRC conflict free.'"[14]

The judgment of the district court is therefore affirmed in part and reversed in part and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[13] Because the statute and final rule fail the third part of the *Central Hudson* test, we need not decide whether they satisfy the second part: that the speech restrictions directly and materially advance the government's asserted interest.

[14] The requirement that an issuer use the particular descriptor "not been found to be 'DRC conflict free'" may arise as a result of the Commission's discretionary choices, and not as a result of the statute itself. We only hold that the statute violates the First Amendment to the extent that it imposes that description requirement. If the description is purely a result of the Commission's rule, then our First Amendment holding leaves the statute itself unaffected.

SRINIVASAN, *Circuit Judge*, *concurring in part*: I concur fully in Parts I, II, and III of the court's opinion, which sustain the SEC's Conflict Minerals Rule against challenges brought by the National Association of Manufacturers under the Administrative Procedure Act and the Securities Exchange Act. Respectfully, I do not join Part IV of the court's opinion, which addresses the Association's First Amendment claim. A question of central significance to the resolution of that claim is pending before the en banc court in another case. I would opt to hold in abeyance our consideration of the First Amendment issue in this case pending the en banc court's decision in the other, rather than issue an opinion that might effectively be undercut by the en banc court in relatively short order.

The intersection between the two cases arises from the way in which the court resolves the Association's First Amendment claim. An essential step in the majority's First Amendment analysis is that the relaxed standard for reviewing compelled commercial-speech disclosures set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), applies only if the disclosure requirement serves a governmental interest in preventing consumer deception. *Ante*, at 18-19. That precise question is currently pending before our en banc court in *American Meat Institute v. United States Department of Agriculture*, No. 13-5281. In that case, a panel of this court (of which I was a member) issued an opinion upholding labeling requirements for meat products under *Zauderer*'s standard, which requires that disclosure mandates be "reasonably related" to the government's interests. __ F.3d __ (slip op. at 11) (quoting *Zauderer*, 471 U.S. at 651). The panel relied on the government's interest in arming consumers with additional information when purchasing food, rejecting the suggestion that *Zauderer* review applies only to disclosure mandates aimed to cure consumer deception. *Id.* at __ (slip op. at 10).

The full court, acting on the panel's suggestion, *id.* at __ (slip op. at 14 n.1), has now voted to rehear the case en banc,

with oral argument set to take place on May 19, 2014. *See* Order, No. 13-5281 (D.C. Cir. Apr. 4, 2014) (en banc) (per curiam). The en banc court will receive supplemental briefing on the question whether review of "mandatory disclosure" obligations can "properly proceed under *Zauderer*" even if they serve interests "other than preventing deception." *Id*. My good colleagues in the majority here assume the answer to that question is no, and their decision on the First Amendment claim rests on that assumption. *Ante*, at 18-19. But if the en banc court in *American Meat* decides otherwise, the First Amendment claim in this case presumably would need to be reconsidered afresh.

To avert that possibility, a panel in such circumstances can elect to withhold its decision until the en banc court decides the potentially dispositive question. *See, e.g.*, *United States v. Johnson*, No. 91-3221, 1993 U.S. App. LEXIS 36925, at *1-2 (D.C. Cir. Dec. 14, 1993) (per curiam) (non-precedential); *United States v. Gerald*, 5 F.3d 563, 565 (D.C. Cir. 1993); *United States v. Dockery*, 965 F.2d 1112, 1113-14 & n.1 (D.C. Cir. 1992); *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 259 (D.C. Cir. 1988); *see also Judicial Watch, Inc. v. Dep't of Energy*, No. 04-5204, 2004 U.S. App. LEXIS 22661, at *2 (D.C. Cir. Oct. 8, 2004) (per curiam) (on court's own motion, ordering parties to show cause why appeal should not be held in abeyance pending en banc court's resolution of related question). The court likewise frequently withholds a decision in analogous situations in which a case potentially implicates a question pending before the Supreme Court. *See, e.g.*, *Wagner v. FEC*, No. 13-5162 (D.C. Cir. Sept. 11, 2013) (en banc) (per curiam); *United States v. Epps*, 707 F.3d 337, 341 (D.C. Cir. 2013); *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 826 (D.C. Cir. 2012); *Belbacha v. Bush*, 520 F.3d 452, 456-57 (D.C. Cir. 2008). Ordinarily, when resolution of a case before a panel could turn on a question under consideration by the en

banc court in a separate case, the latter case would have been pending for some time. The circumstances here are unusual in that regard because this case was docketed shortly before, and presented to the court essentially contemporaneously with, *American Meat*. But because en banc review has now been granted in *American Meat*, my own respectful preference would be to withhold a decision on the First Amendment claim here pending the en banc decision in that case.

To be sure, there is no certainty that the en banc decision in *American Meat* will alter the panel's resolution here. As could always be the case when a panel addresses an issue pending before the en banc court in a different case, the full court might agree with the panel's inclination—here, by concluding that *Zauderer*'s "reasonably related" standard applies only to disclosure requirements aimed to prevent consumer deception. Moreover, even if the en banc court were to decide that *Zauderer* extends more broadly, the majority suggests that the conflict minerals disclosure requirement might fail to satisfy another precondition to *Zauderer* scrutiny, i.e., that the disclosure be factual and non-controversial. *See ante*, at 20. As it stands, though, the majority's decision on the First Amendment challenge hinges on the premise that *Zauderer* applies only to the prevention of deception—the issue now under consideration by the en banc court.

I fully join the court's resolution of the Association's remaining challenges to the SEC's rule, however. The parties understandably desire a final decision from this court before the May 31, 2014, deadline for the first conflict minerals disclosure report. *See* 77 Fed. Reg. 56,274, 56,305 (Sept. 12, 2012). Parts I, II, and III of the court's opinion address non-First Amendment challenges bearing no connection to the en banc proceedings in *American Meat*. Those parts of the court's opinion—which resolve the claims to which the Association devotes its principal

attention—should issue forthwith. *See, e.g.*, *Coke Oven Envtl. Task Force v. EPA*, No. 06-1131, 2006 U.S. App. LEXIS 23499, at *4 (D.C. Cir. Sept. 13, 2006) (per curiam) (severing one aspect of case and holding it in abeyance pending Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007)); *United States v. Coles*, No. 03-3113, 2004 U.S. App. LEXIS 25904, at *3-4 (D.C. Cir. Dec. 13, 2004) (per curiam) (affirming judgment in part and holding remaining portion of case in abeyance pending Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005)); *Wrenn v. Shalala*, No. 94-5198, 1995 U.S. App. LEXIS 8731, at *1-3 (D.C. Cir. Mar. 8, 1995) (per curiam) (non-precedential) (affirming dismissal of certain claims, reversing dismissal of other claims, and holding separate claim in abeyance pending Supreme Court decision in *Kimberlin v. Quinlan*, 515 U.S. 321 (1995)).

That approach would afford a resolution as to the lion's share of the challenges to the SEC's rule in advance of the date by which the parties seek a decision. It would still leave unresolved, though, the more narrowly focused challenge under the First Amendment to the particular requirement that manufacturers categorize certain products as "not found to be 'DRC conflict-free'" in a conflict minerals report. 17 C.F.R. § 249b.400, Form SD, Item 1.01(c)(2). The court, however, could stay enforcement of that aspect of the SEC's rule pending disposition of the Association's First Amendment claim.

In these unique circumstances, there would be strong arguments supporting issuance of a stay under the governing standards. *See generally Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 & n.1 (D.C. Cir. 1977). With regard to the likelihood of success on the merits: the majority concludes that the disclosure requirement fails to satisfy the test of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980); and there are,

at the least, substantial questions concerning *Zauderer*'s applicability given the grant of en banc review in *American Meat* and the majority's suggestion, *ante* at 20, that the disclosure requirement may fail to qualify for *Zauderer* review regardless. With regard to irreparable harm and the balance of equities: "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); and any adverse consequences for the SEC and the public would be limited because a stay would leave the bulk of the SEC's rule (including the disclosure obligations) in place, affecting only the requirement to use a particular phrase. The court perhaps could enter a stay on its own motion, *see* Fed. R. App. P. 2; *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1129 (D.C. Cir. 1978) ("balance of the equities" favors a stay "so much so that we should act sua sponte"), or at least could invite submissions from the parties on the desirability of a stay or order the SEC to show cause why one should not be granted.

It bears noting that there would be no evident need to stay any part of the statute, as opposed to the SEC's rule. The Exchange Act requires covered manufacturers to list products qualifying as "not DRC conflict free" under the statutory definition. 15 U.S.C. § 78m(p)(1)(A)(ii); *see id.* § 78m(p)(1)(D). The Act, however, contains no mandate to use any magic words when categorizing those products. Congress elected to use the descriptor, "not DRC conflict free," in the Act, *id.* § 78m(p)(1)(A)(ii), but Congress imposed no requirement for manufacturers to use that (or any) particular phrase when describing their products. The latter obligation comes from the SEC's rule, not the statute. The rule, moreover, compels use of the phrase, "not been found to be 'DRC conflict free'"—rather than "not DRC conflict free"—an adjustment viewed by the agency to ameliorate any First Amendment objections by allowing for a more "accurate disclosure." 77 Fed. Reg. at

56,323. If the court were to withhold a decision on the Association's First Amendment claim pending the en banc court's decision in *American Meat*, but were to grant temporary relief to the Association in the interim, any stay order presumably would run against the SEC's rule (not the statute) and would correspond to the particular disclosure compelled by that rule.