Opinion for the Court filed by Senior Circuit Judge RANDOLPH.
Dissenting opinion filed by Circuit Judge SRINIVASAN.
On Petitions For Panel Rehearing.
RANDOLPH, Senior Circuit Judge:
We assume familiarity with our opinion in National Association of Manufacturers v. SEC, 748 F.3d 359 (D.C.Cir.2014) (“NAM”).[1]
The subject of this rehearing is the intervening decision in American Meat Institute v. U.S. Department of Agriculture, 760 F.3d 18 (D.C.Cir.2014) (en banc) (“AMI ”), and its treatment of Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985).
Justice White, writing for the majority in Zauderer, expressed the Court’s holding with his customary precision: we “hold,” he wrote, “that an advertiser’s [First Amendment] rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265 (italics added). In several opinions, our court therefore treated Zauderer as limited to compelled speech designed to cure misleading advertising. Government regulations forcing persons to engage in commercial speech for other purposes were evaluated under Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 564-66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), rather than Zauderer.[2] See, e.g., R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1213-17 (D.C.Cir.2012); Nat’l Ass’n of Mfrs. v. NLRB, 717 F.3d 947, 959 n. 18 (D.C.Cir. 2013).[3]
*520 Our initial opinion in this case adhered to circuit precedent and declined to apply Zauderer on the ground that the “conflict minerals”[4] disclosures, compelled by the Dodd-Frank law and the implementing regulations of the Securities and Exchange Commission, we;re unrelated to curing consumer deception. NAM, 748 F.3d at 370-71.
After our opinion in NAM issued, the en banc court in AMI decided that Zauderer covered more than a state’s forcing disclosures in order to cure what would otherwise be misleading advertisements. AMI, 760 F.3d at 21-23. Some other governmental interests might suffice. Using Zauderer’s relaxed standard of review,[5] AMI held that the federal government had not violated the First Amendment when it forced companies to list on the labels of their meat cuts the country in which the animal was born, raised, and slaughtered. Id. at 23, 27. It was of no moment that the governmental objective the AMI court identified as sufficient — enabling “consumers to choose American-made products,” id. at 23 — was one the government disavowed not only when the Department of Agriculture issued its regulations, but also when the Department of Justice defended them in our court, id. at 25; id. at 46-47 (Brown, J., dissenting).[6] The AMI court therefore overruled the portion of our decisions in NAM, R.J. Reynolds, and National Association of Manufacturers v. NLRB holding that the analysis in Zauderer was confined to government compelled disclosures designed to prevent the deception of consumers.
In light of the AMI decision, we granted the petitions of the Securities and Exchange Commission and intervenor Amnesty International for rehearing to consider what effect, if any, AMI had on our judgment that the conflict minerals disclosure requirement in 15 U.S.C. § 78m(p)(l)(A)(ii) & (E), and the Commission’s final rule, 77 Fed.Reg. 56,274, 56,-362-65, violated the First Amendment to *521 the Constitution. See Order of November 18, 2014. For the reasons that follow we reaffirm our initial judgment.
Before we offer our legal analysis, a pervasive theme of the dissent deserves a brief response. To support the conflict minerals disclosure rule, the dissent argues that the rule is valid because the United States is thick with laws forcing “[ijssuers of securities” to “make all sorts of disclosures about their products,” Dissent at 531. Charles Dickens had a few words about this form of argumentation: “ “Whatever is is right’; an aphorism that would be as final as it is lazy, did it not include the troublesome consequence, that nothing that ever was, was wrong.” Charles Dickens, A Tale op Two Cities 65 (Signet Classics) (1859). Besides, the conflict minerals disclosure regime is not like other disclosure rules the SEC administers. This particular rule, the SEC determined, is “quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve.” Conflict Minerals, 77 Fed.Reg. 56,274, 56,350 (Sept. 12, 2012) (codified at 17 C.F.R. §§ 240.13p-l, 249b.400).[7]
As to the First Amendment, we agree with the SEC that “after AMI, whether Zauderer applies in this case is an open question.” Appellee Supp. Br. 10-11. NAM, in its initial briefing and in its supplemental brief on rehearing, argued that Zauderer did not apply to this case, not only because the compelled disclosures here were unrelated to curing consumer deception, but also because this government-compelled speech was not within the Supreme Court’s category of “commercial speech.” Appellants Supp. Br. 18-19; Appellants Br. 53. NAM therefore argued that the commercial speech test of Central Hudson, 447 U.S. at 564-66, 100 S.Ct. 2343, also did not govern the First Amendment analysis in this case.
In our initial decision we did not decide whether the compelled speech here was commercial speech;[8] we assumed arguen *522 do that it was. NAM v. SEC, 748 F.3d at 372. Now on rehearing the question looms again. But before we may confront that broad issue, we address a narrower subsidiary question: whether Zauderer, as now interpreted in AMI, reaches compelled disclosures that are unconnected to advertising or product labeling at the point of sale.
To put the matter differently, even if the conflict minerals disclosures are categorized as “commercial speech,” it may not follow that Zauderer’s loose standard of review[9] rather than the more demanding standard of Central Hudson determines whether the law violates the First Amendment rights of those who are subject to the government’s edicts.
Conflict minerals disclosures are to be made on each reporting company’s website and in its reports to the SEC. In the rulemaking, the SEC acknowledged that the statute — and its regulations — were “directed at achieving overall social benefits,” that the law was not “intended to generate measurable, direct economic benefits to investors or issuers,” and that the regulatory requirements were “quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve.” 77 Fed.Reg. at 56,350.[10]
The SEC thus recognized that this case does not deal with advertising or with point of sale disclosures. Yet the Supreme Court’s opinion in Zauderer is confined to advertising, emphatically and, one may infer, intentionally. In a lengthy opinion, the Court devoted only four pages to the issue of compelled disclosures. Zauderer, 471 U.S. at 650-53, 105 S.Ct. 2265. Yet in those few pages the Court explicitly identified advertising as the reach of its holding no less than thirteen times.[11] Quotations in the preceding footnote prove that the Court was not holding that any time a government forces a commercial entity to state a message of the government’s devising, that entity’s First Amendment interest is minimal. Instead, the Zauderer Court — in a passage AMI quoted, 760 F.3d at 22 — held that the advertiser’s “constitutionally protected interest in not providing any particular factual information in his advertising is minimal.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265 (last italics added).
*523 For these reasons the Supreme Court has refused to apply Zauderer when the case before it did not involve voluntary commercial advertising.[12] In Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), a unanimous Supreme Court treated Zauderer as a decision permitting the government “at times” to “ ‘prescribe what shall be orthodox in commercial advertising’ by requiring the dissemination of ‘purely factual and uncontroversial information.’ ” Hurley, 515 U.S. at 573, 115 S.Ct. 2338. But Hurley went on to stress that “outside that context ” (commercial advertising) the “general rule” is “that the speaker has the right to tailor the speech” and that this First Amendment right “applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid.” Id. (italics added). The Court added that this constitutional rule was “enjoyed by business corporations generally.” Id. at 574, 115 S.Ct. 2338.
United States v. United Foods, Inc., 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), distinguished Zauderer for much the same reason. United Foods claimed that a federal law compelling it to fund generalized advertising for mushrooms violated the company’s First Amendment rights. United Foods thought the mushrooms it produced were superior to others. Although the Court indicated that the United Foods’ forced contribution was commercial speech, the First “Amendment may prevent the government from compelling individuals to express certain views or from compelling certain individuals to pay subsidies for speech to which they object.” Id. at 410,121 S.Ct. 2334 (internal citations omitted). As to Zauderer, the Court found that decision inapplicable because— as in this case — United Foods did not deal with “voluntary advertising” or advertising by the company’s “own choice.” Id. at 416, 121 S.Ct. 2334.[13]
*524 In answer to the SEC’s “open question,” we therefore hold that Zauderer has no application to this case.[14] This puts the case in the same posture as in our initial opinion when we determined that Zauderer did not apply, but for a different reason. As we ruled in our initial decision, we need not decide whether “strict scrutiny or the Central Hudson test for commercial speech” applies. NAM, 748 F.3d at 372. For the reasons we gave in that opinion, id. at 372-73, the SEC’s “final rule does not survive even Central Hudson’s intermediate standard.” Id. at 372. We need not repeat our reasoning in this regard.
But given the flux and uncertainty of the First Amendment doctrine of commercial speech,[15] and the conflict in the circuits regarding the reach of Zauderer,[16] we think it prudent to add an alternative ground for our decision. It is this. Even if the compelled disclosures here are commercial speech and even if AMI’s view of Zauderer governed the analysis, we still believe that the statute and the regulations violate the First Amendment.
To evaluate the constitutional validity of the compelled conflict minerals disclosures, the first step under AMI (and Central Hudson) is to identify and “assess the adequacy of the [governmental] interest motivating” the disclosure requirement. AMI, 760 F.3d at 23. Oddly, the SEC’s Supplemental Brief does not address this subject. In the first round of briefing the SEC described the government’s interest as “ameliorating] the humanitarian crisis in the DRC.” Appellee Br. 26.[17] We will treat this as a sufficient interest of the United States under AMI and Central Hudson.
After identifying the governmental interest or objective, we are to evaluate the effectiveness of the measure in achieving *525 it. AMI, 760 F.3d at 26; see, e.g., Ibanez v. Fla. Dep’t of Bus. & Prof. Reg., 512 U.S. 136, 146, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994); Central Hudson, 447 U.S. at 564-66, 100 S.Ct. 2343.[18] Although the burden was on the government, see Ibanez, 512 U.S. at 146, 114 S.Ct. 2084, here again the SEC has offered little substance beyond citations to statements by two Senators and members of the executive branch, and a United Nations resolution. The government asserts that this is a matter of foreign affairs and represents “the type of ‘value judgment based on the common sense of the people’s representatives’ for which this Court has not required more detailed evidence.” Appellee Br. 64 (quoting Nat’l Ass’n of Mfrs. v. Taylor, 582 F.3d 1, 16 (D.C.Cir.2009)). As the government notes, in the area of foreign relations, “conclusions must often be based on informed judgment rather than concrete evidence.” Holder v. Humanitarian Law Project, 561 U.S. 1, 34-35, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010).
But in the face of such evidentiary gaps, we are forced to assume what judgments Congress made when crafting this rule. The most obvious stems from the cost of compliance, estimated to be $3 billion to $4 billion initially and $207 million to $609 million annually thereafter,[19] see 77 Fed. Reg. at 56,334, and the prospect that some companies will therefore boycott mineral suppliers having any connection to this region of Africa.[20] How would that reduce the humanitarian crisis in the region? The idea must be that the forced disclosure .regime will decrease the revenue of armed groups in the DRC and their loss of revenue will end or at least diminish the humanitarian crisis there. But there is a major problem with this idea — it is entirely unproven and rests on pure speculation.[21]
*526 Under the First Amendment, in commercial speech cases the government cannot rest on “speculation or conjecture.” Edenfield v. Fane, 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). But that is exactly what the government is doing here. Before passing the statute, Congress held no hearings on the likely impact of § 1502. The SEC points to hearings Congress held on prior bills ad- - dressing the conflict in the DRC, but those hearings did not address the statutory provisions at issue in this case. When Congress held hearings after § 1502’s enactment, the testimony went both ways— some suggested the rule would alleviate the conflict, while others suggested it had “had a significant adverse effect on innocent bystanders in the DRC.” The Unintended Consequences of Dodd-Frank’s Conflict Minerals Provision: Hearing Before the Subcomm. on Monetary Policy and Trade of the H. Comm, on Financial Services, 113th Cong. (May 21, 2013) (Statement of Rep. Campbell).
Other post-hoc evidence throws further doubt on whether the conflict minerals rule either alleviates or aggravates the stated problem. As NAM points out on rehearing, the conflict minerals law may have backfired. Because of the law, and because some companies in the United States are now avoiding the DRC, miners are being put out of work or are seeing even their meager wages substantially reduced, thus exacerbating the humanitarian crisis and driving them into the rebels’ camps as a last resort. Appellants Supp. Br. 17; see, e.g., Sudarsan Raghavan, How a Well-Intentioned U.S. Law Left Congolese Miners Jobless, Wash. Post, Nov. 30, 2014; Lauren Wolfe, How Dodd-Frank is Failing Congo, Foreign Pol’y, Feb. 2, 2015.[22]
Our original opinion pointed out that the SEC was unable to quantify any benefits of the forced disclosure regime itself. NAM, 748 F.3d at 364. See 77 Fed.Reg. at 56,335 (“The statute therefore aims to achieve compelling social benefits, which we are unable to readily quantify with any precision.”). The Government Accountability Office has refrained from addressing the issue, even though the conflict minerals statute required it to assess the effectiveness of the required disclosures in relieving the humanitarian crises. 15 U.S.C. § 78m(p)(l)(A)(ii) & (E); see U.S. G.A.O., Conflict Minerals: Stakeholder Options for Responsible Sourcing Are Expanding, But More Information on Smelters Is Needed 3 (June 26, 2014) (“[W]e have not yet addressed the effectiveness of SEC’s conflict minerals rule as required under the legislation.”).[23]
*527 That is not to say that we know for certain that the conflict minerals rule will not help — other sources contend the rule will do so.[24] But it is to say that whether § 1502 will work is not proven to the degree required under the First Amendment to compel speech.
All of this presents a serious problem for the SEC because, as we have said, the government may not rest on such speculation or conjecture. Edenfield v. Fane, 507 U.S. at 770, 113 S.Ct. 1792. Rather the SEC had the burden of demonstrating that the measure it adopted would “in fact alleviate” the harms it recited “to a material degree.” Id. at 771, 113 S.Ct. 1792; see, e.g., Ibanez, 512 U.S. at 146, 114 S.Ct. 2084; Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion); Pearson v. Shalala, 164 F.3d 650, 659 (D.C.Cir.1999); Action for Children’s Television v. FCC, 58 F.3d 654, 665 (D.C.Cir. 1995) (en banc). The SEC has made no such demonstration in this case and, as we have discussed, during the rulemaking the SEC conceded that it was unable to do so.
This in itself dooms the statute and the SEC’s regulation. If that were not enough, we would move on to evaluate another aspect of AMI, an aspect of the opinion on which two of the supplemental briefs on rehearing (those of the SEC and NAM) focus — namely, whether the compelled disclosures here are “purely factual and uncontroversial,” AMI, 760 F.3d at 26 (quoting Zauderer, 471 U.S. at 651, 105 S.Ct. 2265). The intervenors, although supporting the SEC, write in their supplemental brief that AMI “sheds little light on whether Zauderer’s reference to ‘purely factual and uncontroversial information’ states a legal standard and, if so, what the standard means.” Intervenors Supp. Br. 8. They continue: “Zauderer itself used the phrase ... to characterize the particular information subject to disclosure in that case, not to articulate a legal test,” id. at 9. They add that the term “uncontroversial” is .“ill-suited to establishing an element of a legal standard,” id. at 11. In support, the intervenors cite the Sixth Circuit’s decision that the “purely factual and uncontroversial” phrase from Zauderer, which the Supreme Court’s opinion mentioned only once and not in its statement of the holding, was merely descriptive and not a legal standard. Disc. Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509, 559 n. 8 (6th Cir.2012) (opinion for the court by Stranch, J.).
However persuasive we might find the intervenors’ argument,[25] we see no way to read AMI except as holding that — to quote AMI — Zauderer “requires the disclosure to be of ‘purely factual and uncontroversial information’ about the good or service being offered.” AMI, 760 F.3d at 27. We are therefore bound to follow that holding. See LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C.Cir.1996) (en banc).
*528 Even so, the intervenors are correct that the AMI majority “made no attempt to define those terms precisely.” Intervenors Supp. Br. 9. AMI did speak of “controversial in the sense that [the compelled speech] communicates a message that is controversial for some reason other than [a] dispute about simple factual accuracy.” AMI, 760 F.3d at 27. Judge Kavanaugh, concurring in the judgment in AMI, wrote that “it is unclear how we should assess and what we should examine to determine whether a mandatory disclosure is controversial.” Id. at 34 (Kavanaugh, J., concurring in the judgment).
One clue is that “uncontroversial,” as a legal test, must mean something different than “purely factual.” Hence, the statement in AMI we just quoted, describing “controversial in the sense that [the compelled speech] communicates a message that is controversial for some reason other than [a] dispute about simple factual accuracy.” AMI, 760 F.3d at 27. Perhaps the distinction is between fact and opinion. But that line is often blurred, and it is far from clear that all opinions are controversial. Is Einstein’s General Theory of Relativity fact or opinion, and should it be regarded as controversial? If the government required labels on all internal combustion engines stating that “USE OF THIS PRODUCT CONTRIBUTES TO GLOBAL WARMING” would that be fact or opinion? It is easy to convert many statements of opinion into assertions of fact simply by removing the words “in my opinion” or removing “in the opinion of many scientists” or removing “in the opinion of many experts.”[26] Cf Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, — U.S. -, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015); Frederick Schauer, Facts and the First Amendment, 57 UCLA L. Rev. 897 (2010). It is also the case that propositions once regarded as factual and uncontroversial may turn out to be something quite different.[27] What time frame should a court use in assessing this? At the time of enactment of the disclosure statute? At the time of an agency’s rulemaking implementing the disclosure statute? Or at some later time when the compelled disclosures are no longer considered “purely factual” or when *529 the disclosures have become “controversial”?
That the en banc court viewed the country-of-origin disclosures at issue in AMI as “uncontroversial” poses another puzzle. A controversy, the dictionaries tell us, is a dispute, especially a public one.[28] Was there a dispute about the country-of-origin disclosures in AMI or as AMI put it, was there a controversy “for some reason other than [a] dispute about simple factual accuracy”? AMI, 760 F.3d at 27. One would think the answer surely was yes. As we explained earlier, while AMI was pending a panel of the World Trade Organization was conducting a proceeding in which other nations charged that the country-of-origin labeling law violated the treaty obligations of the United States, a controversy that later resulted in a ruling against the United States. See supra n. 6.
In its Supplemental Brief, the SEC invoked for the first time Meese v. Keene, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), describing the case as one in which “the Supreme Court rejected a First Amendment challenge to compelled disclosures accompanying materials that met the statutory definition of ‘political propaganda,”’ Appellee Supp. Br. 16. The SEC’s description is not accurate. Keene was not a compelled speech case. An agency of the Canadian government distributed films the Department of Justice considered “political propaganda” under the Foreign Agents Registration Act. This triggered the requirement that the foreign agent— Canada — affix a label to the material identifying its source. The label did not contain the words “political propaganda.” Keene, 481 U.S. at 470-71, 107 S.Ct. 1862. The Court made clear that the constitutionality of this disclosure regime was “not at issue in this case.” Id. at 467, 107 S.Ct. 1862. The plaintiff — an attorney and state legislator — wanted to show the films and claimed that the government’s considering the films “propaganda” violated his First Amendment rights, a claim the Court rejected. The attorney was under no disclosure obligations and he was free to remove the label the Canadian government had affixed to the film packaging. As NAM’s Supplemental Brief points out, Keene “did not suggest, much less hold, that it would be constitutionally permissible for Congress to force filmmakers to label their own films as ‘political propaganda’ — or not ‘propaganda free’ — however the term was defined.” Appellants Supp. Br. 13.
, We agree with NAM that the statutory definition of “conflict free” cannot save this *530 law. See Entm’t Software Ass’n v. Blagojevich, 469 F.3d 641, 652 (7th Cir.2006); cf. Video Software Dealers Ass’n v. Schwarzenegger, 556 F.3d 950, 965-67 (9th Cir. 2009). As NAM forcefully puts it, “[i]f the law were otherwise, there would be no end to the government’s ability to skew public debate by forcing companies to use the government’s preferred language. For instance, companies could be compelled to state that their products are not ‘environmentally sustainable’ or ‘fair trade’ if the government provided ‘factual’ definitions of those slogans — even if the companies vehemently disagreed that their [products] were ‘unsustainable’ or ‘unfair.’” Appellants Supp. Br. 12.[29]
In our initial opinion we stated that the description at issue — whether a product is “conflict free” or “not conflict free” — was hardly “factual and non-ideological.” NAM, 748 F.3d at 371.[30] We put it this way: “Products and minerals do not fight conflicts. The label ‘[not] conflict free’ is a metaphor that conveys moral responsibility for the Congo war. It requires an issuer to tell consumers that its products are ethically tainted, even if they only indirectly finance armed groups. Ah issuer, including an issuer who condemns the atrocities of the Congo war in the strongest terms, may disagree with that assessment of its moral responsibility. And it may convey that ‘message’ through ‘silence.’ See Hurley, 515 U.S. at 573, 115 S.Ct. 2338. By compelling an issuer to confess blood on its hands, the statute interferes with that exercise of the freedom of speech under the First Amendment. See id.” NAM, 748 F.3d at 371.
We see no reason to change our analysis in this respect. And we continue to agree with NAM[31] that “[requiring a company to publicly condemn itself is undoubtedly a more ‘effective’ way for the government to stigmatize and shape behavior than for the government to have to convey its views itself, but that makes the requirement more constitutionally offensive, not less so.” Appellants Reply Br. 27-28.
For all these reasons, we adhere to our original judgment “that 15 U.S.C. § 78m(p)(l)(A)(ii) & (E), and the Commission’s final rule, 77 Fed.Reg. at 56,362-65, violate the First Amendment to the extent the statute and rule require regulated entities to report to the Commission and to state on their website that any of their products have ‘not been found to be “DRC conflict free.” ’ ”[32] NAM, 748 F.3d at 373.

So ordered.

. For ease of reference, our original opinion and the accompanying concurrence are reprinted in an Appendix to this opinion after the dissent.

. The Central Hudson standard is more demanding than Zauderer's but much less exacting than the Supreme Court’s doctrines for evaluating non-commercial speech. See, e.g., Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 249, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010); Ibanez v. Fla. Dep’t of Bus. & Prof'l Regulation, Bd. of Accountancy, 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994).

. See In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982), holding that when the commercial advertising "is not misleading” the State’s regulations, including forced disclosures, must be tested under Central Hudson. The Supreme Court later inter- . preted R.M.I. to mean that when. advertisements are "not inherently misleading,” state-compelled disclosures are to be tested by “Central Hudson's intermediate scrutiny,” rather than by Zauderer’s looser standard. Milavetz, 559 U.S. at 250, 130 S.Ct. 1324. See also Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 491, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (Souter, J., dissenting, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas); Spirit Airlines, Inc. v. Dep’t of Transp., 687 F.3d 403, 412 (D.C.Cir.2012).

. Gold, tantalum, tin, and tungsten.

. The AMI court held that Zauderer — unlike Central Hudson — does not require the government to prove that its disclosure requirement will accomplish its objective. AMI, 760 F.3d at 26.

. The en banc court framed the governmental interest in terms of enabling consumers to buy American products, id. at 23-24, but the government refrained from articulating any such interest. The only interest the government asserted in AMI was the open-ended, unbounded notion of providing consumers with information when they make their purchasing decisions.
The government’s unwillingness to frame its interest in protectionist terms, as the en banc court did, is understandable. While AMI was pending before the panel, and then before the court en banc, the World Trade Organization was conducting a proceeding to determine whether the United States, by requiring country-of-origin labeling, violated its treaty obligations not to engage in protectionism. Canada and Mexico, joined by other countries, had filed a complaint so alleging.
On October 20, 2014, after the AMI en banc opinion issued, the WTO compliance panel ruled against the United States. The panel held that the statute and regulations at issue in the AMI case violated the treaty obligations of the United States because the regulations accord less favorable treatment to imported livestock than to domestic livestock. The WTO’s Appellate Body rejected the United States' appeal on May 18, 2015. GATT Dispute Panel on United States-Certain Country of Origin Labeling (COOL) Requirements, Article 21.5 Panel Report (Oct. 20, 2014), Appellate Body Report (May 18, 2015), WT/DS384/RW, WT/DS386/RW. Ganada has requested authorization to retaliate and some expect a trade war. See Gov't of Canada, Canada to Seek WTO Authorization in Response to Country of Origin Labeling; Editorial: Time to Lose COOL. Avoid Trade War, After WTO Ruling, HERALD NEWS (CAN.), May 19, 2015; Krista Hughes, U.S. Loses Meat Labeling Case; 'Trade War Looms, Reuters, May 18, 2015.

. The dissent likens the disclosures here to the "mine-run of uncontroversial requirements to disclose factual information to consumers.” Dissent at 532. But consumer protection was not a reason for the conflict minerals disclosure regime. As the Commission noted, "unlike in most of the securities laws, Congress intended the Conflict Minerals Provision to serve a humanitarian purpose,” 77 Fed.Reg. at 56,350, and that purpose was to reduce the trade in minerals from the DRC in order "to inhibit the ability of armed groups in the [DRC] to fund their activities.” Id. at 56,276.

. It is easier to discern what the Supreme Court does not consider "commercial speech” than, to determine what speech falls within that category. See Nike, Inc. v. Kasky, 539 U.S. 654, 655, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (per curiam) (writ of certiorari dismissed as improvidently granted).
For instance, even if "money is spent to project” speech, this does not make it commercial speech. See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 761, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Otherwise there is no explaining cases such as New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Speech "carried in a form” sold for profit does not render it commercial speech under the Court's decisions. Va. Pharmacy, 425 U.S. at 761, 96 S.Ct. 1817. Otherwise books, newspapers, and television programming would all be commercial speech. Id. Not all speech soliciting money is commercial speech. Otherwise, Riley v. National Federation of the Blind of North Carolina, 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), and other cases such as Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), would have been decided differently. The Court has also determined that just because the speech is about "a commercial subject,” it does not fall into the category of commercial speech, otherwise “business section editorials would be commercial speech; and it isn't even factual speech on a commercial subject, or else business section news reporting would *522 be commercial speech.” Alex Kozinski & Stuart Banner, Who’s Afraid, of Commercial Speech?, 76 Va. L.Rev. 627, 638 (1990) (citing Va. Pharmacy, 425 U.S. at 761-62, 96 S.Ct. 1817).

. See Milavetz, Gallop & Milavetz, 559 U.S. at 249, 130 S.Ct. 1324; and note 5 supra.

. See Mary Jo White, Chairwoman, Sec. & Exch. Comm'n, A.A. Sommer, Jr. Corporate Securities and Financial Law Lecture, Ford-ham Law School (Oct. 3, 2013) ("Seeking to improve safety in mines for workers or to end horrible human rights atrocities in the Democratic Republic of the Congo are compelling objectives, which, as a citizen, I wholeheartedly share. But, as the Chair of the SEC, I must question, as a policy matter, using the federal securities laws and the SEC’s powers of mandatory disclosure to accomplish these goals.”).

.Consider the following excerpts from Zauderer with our italics added: "the Daikon Shield advertisement," id. at 650, 105 S.Ct. 2265; "the advertisement, absent the required disclosure,” id.; "In requiring attorneys who advertise," id.; "The State has attempted only to prescribe what shall be orthodox in commercial advertising," id. at 651, 105 S.Ct. 2265; “a requirement that appellant include in his advertising purely factual and uncontroversial information,” id.; “appellant’s constitutionally protected interest in not providing any particular factual information in his advertising is minimal," id.; "an advertiser's interests,” id.; "the advertiser’s First Amendment rights,” id.; "an advertiser’s rights,” id.; "attorney advertising," id. at 652, 105 S.Ct. 2265; "Appellant’s advertisement," id.; "The advertisement,” id.; "The State’s position that it is deceptive to employ advertising,” id.

. Whatever the commercial speech doctrine entails, commercial advertising is at least at the heart of the matter. See, e.g., Central Hudson, 447 U.S. at 563, 100 S.Ct. 2343 (“The First Amendment's concern for commercial speech is based on the informational function of advertising.”); Pittsburgh Press Co. v. Pittsburgh Comm’n on Human Relations, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (“The critical feature of the advertisement [making it commercial speech] was that ... it did no more than propose a commercial transaction....”); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("[T]he core notion of commercial speech [is] speech which does no more than propose a commercial transaction.” (internal quotation marks omitted)); Spirit Airlines, 687 F.3d at 412 ("The speech at issue here — the advertising of prices — is quintessential^ commercial insofar as it seeks to do no more than propose a commercial transaction.” (internal quotation marks omitted)); Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth., 134 F.3d 87, 97 (2d Cir.1998) ("The ‘core notion' of commercial speech includes 'speech which does no more than propose a commercial transaction.' Outside this so-called ‘core’ lie various forms of speech that combine commercial and noncommercial elements. Whether a communication combining those elements is to be treated as commercial speech depends on factors such as whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication.” (internal citations omitted)).

. The AMI en banc majority did not mention Hurley's or United Foods’s distinction of Zauderer. Perhaps the cases escaped attention or perhaps the AMI majority believed that product labeling at the point of sale was simply an adjunct of advertising, to which Zauderer did apply. The dissent in this case would dismiss Hurley and United Foods on the ground that both opinions were merely describing “Zauderer 's factual context.” Dissent at 536. This will not wash. Of course both opinions describe Zauderer. The important point is why Hurley and United Foods do so — to explain *524 that Zauderer did not apply because the case before the Court did not involve commercial advertising (Hurley) or voluntary advertising (iUnited Foods).

.In calling our holding a "newly minted constriction oí Zauderer" to advertising, Dissent at 535, the dissent distorts not only the language of Zauderer itself, but also the Supreme Court's decisions in Hurley and United ■Foods distinguishing Zauderer on the ground that it applied only to commercial or voluntary advertising.
The dissent also detects an anomaly: if the conflict minerals disclosure were required at the point of sale of the company’s product, Zauderer would apply but if, as here, the disclosure is required once a year on the company's website, Central Hudson applies. Dissent at 535-36. What the dissent fails to see is that this dichotomy results from the AMI decision stretching Zauderer to cover laws compelling disclosures at the time of sale for reasons other than preventing, consumer deception. In other words if there is something anomalous, it is attributable to AMI, not our decision here, which follows Supreme Court precedents confining the Zauderer standard to "voluntary advertising.” United Foods, 533 U.S. at 416, 121 S.Ct. 2334.

. See AMI, 760 F.3d at 43 (Brown, J., dissenting).

. See Dwyer v. Cappell, 762 F.3d 275, 282-85 (3d Cir.2014); Disc. Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509, 559 n. 8 (6th Cir.2012) (opinion for the court by Stranch, J.); Entm’t Software Ass'n v. Blagojevich, 469 F.3d 641, 651-53 (7th Cir.2006); Nat’l Elec. Mfrs. Ass’n v. Sorrell, 272 F.3d 104, 115 (2d Cir.2001).

. The SEC said much the same in the rule-making — that the interest was "the promotion of peace and security in the Congo,” rather than "economic or investor protection benefits that [SEC] rules ordinarily strive to achieve.” 77 Fed.Reg. at 56,350; see also id. at 56,276. In fact, the statute and rule "may provide significant advantage to foreign companies that are not reporting in the United States” and may place public companies in this country at a "competitive disadvantage” against private companies who are not subject to the SEC’s reporting rules. Id. at 56,-350.

. Show us not the aim without the way.
For ends and means on earth are so entangled That changing one, you change the other too; Each different path brings other ends in view.
Arthur Koestler, Darkness at Noon 241 (1940).

. A recent study suggests companies spent "roughly $709 million and six million staff hours last year to comply with” the conflict minerals rule. Emily Chasan, U.S. Firms Struggle to Trace ‘Conflict Minerals’, The Wall Street Journal, Aug. 3, 2015.

. The SEC made this point in the rulemaking:
The high cost of compliance provides an incentive for issuers to choose only suppliers that obtain their minerals exclusively from outside the Covered Countries, thereby avoiding the need to prepare a Conflict Minerals Report. To the extent that Covered Countries are the lowest cost suppliers of the minerals affected by the statute, [such] issuers ... would have to increase the costs of their products to recoup the higher costs.
Conflict Minerals, 77 Fed.Reg. at 56,351.

.This problem was raised by one of the SEC Commissioners during an open meeting:
The SEC’s conflict minerals rulemaking suffers from an analytical gap that I cannot overlook — namely, there is a failure to assess whether and, if so, the extent to which the final rule will in fact advance its humanitarian goal as opposed to unintentionally making matters worse. Indeed, based on some of the comments] that the Commission has received, there is reason to worry that, contrary to the aims of Section 1502, a chief consequence of the final rule could be that it actually worsens conditions in the DRC.... Because this rulemaking lacks any analysis of whether the benefits will materialize — failing to assess how the choices the Commission has made will impact life on the ground in the DRC — I am unable to support the recommendation and respectfully dissent.
Troy A. Paredes, Commissioner, Sec. & Exch. Comm’n, Statement at Open Meeting to Adopt a Final Rule Regarding Conflict Minerals Pursuant to Section 1502 of the DoddFrank Act, Washington, D.C. (Aug. 22, 2012).

. See Aloys Tegera et al., Open Letter, Sept. 9, 2014 ("[T]he conflict minerals movement has yet to lead to meaningful improvement on the ground, and has had a number of unintended and damaging consequences. Nearly four years after the passing of the DoddFrank Act, only a small fraction of the hundreds of mining sites in the eastern DRC have been reached by traceability or certification efforts. The rest remain beyond the pale, forced into either illegality or collapse as certain international buyers have responded to the legislation by going 'Congo-free.' This in turn has driven many miners into the margins of legality ... and in areas where mining has ceased, local economies have suffered.”).

. The Department of Commerce is charged in Dodd-Frank with compiling a list of "all known conflict mineral processing facilities worldwide.” Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111-203, § 1502(d)(3)(C), 124 Stat. 1376, 2217 (2010). Instead, it compiled a list of "all known processing facilities” for gold, tantalum, tin, or tungsten, but did "not indicate whether a specific facility processes minerals that are used to finance conflict in the [DRC] or an adjoining country.” The Department confessed that it "do[es] not have the ability to distinguish such facilities.” International Trade Administration, Department of Commerce, Reporting Requirements Under Sec *527 tion 1502(d)(3)(C) of the Dodd-Frank Act World-Wide Mineral Processing Facilities, Sept. 5, 2014.

. See John Prendergast et al., Suffocating Congo's War, Foreign Pol'y, Feb. 7, 2015 (responding tp Wolfe, How Dodd-Frank is Failing Congo); Zainab Hawa Bangura, Sexual Violence and Conflict Minerals: International Demand Fuels Cycle, The Guardian, June 18, 2014.

. In our initial opinion we quoted the holding in Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), that the cases dealing with forced ideological messages "cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact.' " NAM, 748 F.3d at 371 (quoting Riley, 487 U.S. at 797, 108 S.Ct. 2667); see also Va. Pharmacy, 425 U.S. at 762, 96 S.Ct. 1817.

. The conflict minerals provisions contain a “Sense of Congress” preamble, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111-203, § 1502(a), 124 Stat. 1376, 2213 (2010), which strikes us not as a statement of fact but a statement of opinion. Some courts treat such provisions as precatory. See, e.g., Yang v. Cal. Dep’t of Social Servs., 183 F.3d 953, 958 (9th Cir.1999); Monahan v. Dorchester Counseling Ctr., 961 F.2d 987, 994-95 (1st Cir.1992); Trojan Techs., Inc. v. Pennsylvania, 916 F.2d 903, 909 (3d Cir.1990). We have previously noted that a "sense of Congress provision” may be used by that body to voice disagreement with an opinion of this court, Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 877 (D.C.Cir.2006), and that such a provision may be non-binding, Emergency Coal, to Defend Educ. Travel v. U.S. Dep’t of the Treasury, 545 F.3d 4, 14 n. 6 (D.C.Cir.2008).

. To illustrate, consider National Commission on Egg Nutrition v. FTC, 570 F.2d 157 (7th Cir.1977), a case cited in Zauderer, 471 U.S. at 645, 105 S.Ct. 2265. The Seventh Circuit upheld the FTC’s order requiring petitioners to cease placing newspaper advertisements stating that eating eggs does not increase a person’s cholesterol level and to make certain disclosures. Petitioners’ advertisements, and other statements like it, were considered false and misleading. Nat’l Comm’n on Egg Nutrition, 570 F.2d at 160-61. But the tables have turned. In its 2015 report, the Dietary Guidelines Advisory Committee of the Department of Agriculture found that there was “no appreciable relationship between consumption of dietary cholesterol and serum [blood] cholesterol.” 'U.S. Dep’t of Agrie., Scientific Report of the 2015 Dietary Guidelines Advisory Committee, Part D Ch. 1, 17 (2015).

. The dissent claims that under AMI, "purely factual and uncontroversial” means "purely factual” and "accurate.” Dissent at 537-38. In so twisting the phrase, the dissent turns it into a redundancy. Is there such a thing as a "purely factual” proposition that is not "accurate”? The en banc majority in AMI, which used the phrase as a First Amendment test, did not think so. AMI described an unconstitutional compelled disclosure as one "communicat[ing] a message that is controversial for some reason other than dispute about simple factual accuracy." AMI, 760 F.3d at 27 (italics added).
In struggling to provide content to this portion of AMI, the dissent asserts that a "misleading disclosure, by definition, would not convey accurate information to a consumer” and therefore would not be "uncontroversial.” Dissent at 539. But as Mark Twain wrote, "Often, the surest way to convey misinformation is to tell the strict truth.” Pudd’nhead Wilson’s New Calendar in Mark Twain, Following the Equator 567 (1st ed. 1897). See Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). It is also worth noting that the attorney in Zauderer provided, as the dissent puts it, "factually accurate information” to consumers: his advertisement informed potential clients that if there were "no recovery, no legal fees are owed by our clients.” Zauderer, 471 U.S. at 631, 105 S.Ct. 2265. The trouble was that he did not mention that they would still be liable for other expenses.

. A famous example of governmental redefinition comes to mind:
WAR IS PEACE FREEDOM IS SLAVERY IGNORANCE IS STRENGTH George Orwell, Nineteen Eighty-Four 4 (Signet Classic) (1949).

. See Entm’t Software Ass’n v. Blagojevich, 469 F.3d at 652.

. Two of the five SEC Commissioners have expressed the same sentiment: "Requiring persons to presume their guilt by association with the current tragedy in the Congo region unless proven otherwise is neither factual nor uncontroversial.” Yin Wilczek, SEC Argues Its Conflict Minerals Rule Survives First Amendment Scrutiny, Bloomberg BNA, Dec. 12, 2014 (quoting Joint Statement of Commissioners Gallagher and Piwowar).

.As we stated in our initial opinion, the "requirement that an issuer use the particular descriptor 'not been found to be "DRC conflict free” ’ may arise as a result of the Commission’s discretionary choices, and not as a result of the statute itself. We only hold that the statute violates the First Amendment to the extent that it imposes that description requirement. If the description is purely a result of the Commission’s rule, then our First Amendment holding leaves the statute itself unaffected.” NAM, 748 F.3d at 373 n. 14. The Commission has not shed any light on this in its recent filings with our court.