Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
Opinion concurring in part filed by Circuit Judge ROGERS.
Opinion concurring in the judgment filed by Circuit Judge KAVANAUGH.
Dissenting opinion filed by Circuit Judge HENDERSON.
Dissenting opinion filed by Circuit Judge BROWN, which Circuit Judge HENDERSON joins.
WILLIAMS, Senior Circuit Judge:
Reviewing a regulation of the Secretary of Agriculture that mandates disclosure of country-of-origin information about meat products, a panel of this court rejected the plaintiffs’ statutory and First Amendment challenges. The panel found the plaintiffs unlikely to succeed on the merits and affirmed the district court’s denial of a preliminary injunction. On the First Amendment claim, the panel read Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), to apply to disclosure mandates aimed at addressing problems other than deception (which the mandate at issue in Zauderer had been designed to remedy). Noting that prior opinions of the court might be read to bar such an application of Zauderer, the panel proposed that the case be reheard en banc. The full court shortly voted to do so. Order, American Meat Institute v. USDA, No. 13-5281, 2014 WL 2619836 (D.C.Cir. Apr. 4, 2014) (vacating the judgment issued on Mar. 28, 2014, and ordering rehearing en banc). We now hold that Zauderer in fact does reach beyond problems of deception, sufficiently to encompass the disclosure mandates at issue here.
Congress has required country-of-origin labels on a variety of foods, including some meat products, 7 U.S.C. §§ 1638, 1638a, and tasked the Secretary of Agriculture with implementation, id. § 1638c. In the original statute, Congress did not define “country of origin,” leaving that to the agency. Pub.L. No. 107-171, § 282, 116 Stat. 134, 533 (2002). After delaying the statute’s implementation, see, e.g., Pub.L. No. 108-199, § 749, 118 Stat. 3, 37 (2004), Congress amended it in 2008 to define “country of origin,” Pub.L. No. 110-234, § 11002, 122 Stat. 923, 1351-52 (2008). See also 153 Cong. Rec. 20,843 (2007) (statement of Rep. Peterson) (explaining the 2008 amendment as a compromise to allow the delayed country-of-origin mandate to go into effect). For meat cuts, at least, the amended statute defined country of origin based on where the animal has been born, raised, and slaughtered — the three major production steps. 7 U.S.C. § 1638a(a)(2).
The Secretary, whom we refer to interchangeably with his delegate the Agricultural Marketing Service (“AMS”), first promulgated rules in 2009. Mandatory Country of Origin Labeling, 74 Fed.Reg. 2658 (Jan. 15, 2009) (“2009 rule”). The rules did not demand explicit identification of the production step(s) occurring in each listed country, but called more simply for labeling with a phrase starting “Product of,” followed by mention of one or more countries. 7 C.F.R. § 65.400 (2010). The 2009 rule also made allowance for a production practice known as “commingling.” This made the labeling of meat cuts from animals of different origins processed together on a single production day relatively simple; the label could just name all the *21 countries of origin for the commingled animals. Id. § 65.300(e)(2), (e)(4).
After the 2009 rule’s adoption, Canada and Mexico filed a complaint with the Dispute Settlement Body of the World Trade Organization. In due course the WTO’s Appellate Body found the rule to be in violation of the WTO Agreement on Technical Barriers to Trade. See Appellate Body Report, United States—Certain Country of Origin Labelling (COOL) Requirements, WT/DS384/AB/R (June 29, 2012). The gravamen of the WTO’s decision appears to have been an objection to the relative imprecision of the information required by the 2009 rule. See id. ¶ 343. In a different section of its opinion, the Appellate Body seemed to agree with the United States that country-of-origin labeling in general can serve a legitimate objective in informing consumers. Id. ¶ 453. A WTO arbitrator gave the United States a deadline to bring its requirements into compliance with the ruling.
The Secretary responded with a rule requiring more precise information — revealing the location of each production step. Mandatory Country of Origin Labeling, 78 Fed.Reg. 31,367 (May 24, 2013) (“2013 rule”). For example, meat derived from an animal born in Canada and raised and slaughtered in the United States, which formerly could have been labeled “Product of the United States and Canada,” would now have to be labeled “Born in Canada, Raised and Slaughtered in the United States.” In a matter of great concern to plaintiffs because of its cost implications, the 2013 rule also eliminated the flexibility allowed in labeling commingled animals. Id. at 31,367/3.
The plaintiffs, a group of trade associations representing livestock producers, feedlot operators, and meat packers, whom we’ll collectively call American Meat Institute (“AMI”), challenged the 2013 rule in district court as a violation of both the statute and the First Amendment. This led to the decisions summarized at the outset of this opinion.
AMI argues that the 2013 rule violates its First Amendment right to freedom of speech by requiring it to disclose country-of-origin information to retailers, who will ultimately provide the information to consumers. See 7 U.S.C. § 1638a(e). The question before us, framed in the order granting en banc review, is whether the test set forth in Zauderer, 471 U.S. at 651, 105 S.Ct. 2265, applies to government interests beyond consumer deception. Instead, AMI says, we should apply the general test for commercial speech restrictions formulated in Central Hudson, 447 U.S. 557, 566, 100 S.Ct. 2343 (1980). Given the scope of the court’s order, we assume the correctness of the panel’s rejection of plaintiffs’ statutory claims.
* * *
The starting point common to both parties is that Zauderer applies to government mandates requiring disclosure of “purely factual and uncontroversial information” appropriate to prevent deception in the regulated party’s commercial speech. The key question for us is whether the principles articulated in Zauderer apply more broadly to factual and uncontroversial disclosures required to serve other government interests. AMI also argues that even if Zauderer extends beyond correction of deception, the government has no interest in country-of-origin labeling substantial enough to sustain the challenged rules.
Zauderer itself does not give a clear answer. Some of its language suggests possible confinement to correcting deception. Having already described the disclosure mandated there as limited to “purely factual and uncontroversial information about the terms under which [the transaction was proposed],” the Court said, “we hold that an advertiser’s rights are ade *22 quately protected as long as [such] disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” 471 U.S. at 651, 105 S.Ct. 2265. (It made no finding that the advertiser’s message was “more likely to deceive the public than to inform it,” which would constitutionally subject the message to an outright ban. See Central Hudson, 447 U.S. at 563, 100 S.Ct. 2843.) The Court’s own later application of Zauderer in Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010), also focused on remedying misleading advertisements, which was the sole interest invoked by the government. Id. at 249, 130 S.Ct. 1324. Given the subject of both cases, it was natural for the Court to express the rule in such terms. The language could have been simply descriptive of the circumstances to which the Court applied its new rule, or it could have aimed to preclude any application beyond those circumstances. Cf. Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821) (Marshall, C.J., warning against extending general language of an opinion into different contexts), quoted in Arkansas Game and Fish Comm’n v. United States, — U.S. -, 133 S.Ct. 511, 520, 184 L.Ed.2d 417 (2012).
The language with which Zauderer justified its approach, however, sweeps far more broadly than the interest in remedying deception. After recounting the elements of Central Hudson, Zauderer rejected that test as unnecessary in light of the “material differences between disclosure requirements and outright prohibitions on speech.” Zauderer, 471 U.S. at 650, 105 S.Ct. 2265. Later in the opinion, the Court observed that “the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed.” Id. at 652 n. 14, 105 S.Ct. 2265. After noting that the disclosure took the form of “purely factual and uneontr-oversial information about the terms under which [the] services will be available,” the Court characterized the speaker’s interest as “minimal”: “Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant’s constitutionally protected interest in not providing any particular factual information in his advertising is minimal.” Id. at 651, 105 S.Ct. 2265 (citation omitted). All told, Zauderer ’s characterization of the speaker’s interest in opposing forced disclosure of such information as “minimal” seems inherently applicable beyond the problem of deception, as other circuits have found. See, e.g., N.Y. State Rest. Ass’n v. N.Y. City Bd. of Health, 556 F.3d 114, 133 (2d Cir.2009); Pharm. Care Mgmt. Ass’n v. Rowe, 429 F.3d 294, 310 (1st Cir.2005) (Torruella, J.); id. at 316 (Boudin, C.J. & Dyk, J.); id. at 297-98 (per curiam) (explaining that the opinion of Chief Judge Boudin and Judge Dyk is controlling on the First Amendment issue); Nat’l Elec. Mfrs. Ass’n v. Sorrell, 272 F.3d 104, 113-15 (2d Cir.2001).
To the extent that other cases in this circuit may be read as holding to the contrary and limiting Zauderer to cases in which the government points to an interest in correcting deception, we now overrule them.[1] See, e.g., Nat’l Ass’n of Mfrs. v. *23 SEC, 748 F.3d 359, 370-71 (D.C.Cir.2014); Nat’l Ass’n of Mfrs. v. NLRB, 717 F.3d 947, 959 n. 18 (D.C.Cir.2013); R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1214 (D.C.Cir.2012).
In applying Zauderer, we first must assess the adequacy of the interest motivating the country-of-origin labeling scheme. AMI argues that, even assuming Zauderer applies here, the government has utterly failed to show an adequate interest in making country-of-origin information available to consumers. AMI disparages the government’s interest as simply being that of satisfying consumers’ “idle curiosity.” Counsel for AMI acknowledged during oral argument that her theory would as a logical matter doom the statute, “if the only justification that Congress has offered is the justification that it offered here.... ” Oral Argument Tr. 18, American Meat Institute v. USDA, No. 13-5281 (D.C.Cir. May 19, 2014) (en banc).
Beyond the interest in correcting misleading or confusing commercial speech, Zauderer gives little indication of what type of interest might suffice. In particular, the Supreme Court has not made clear whether Zauderer would permit government reliance on interests that do not qualify as substantial under Central Hudson ’s standard, a standard that itself seems elusive. Cf. Kansas v. United States, 16 F.3d 436, 443 (D.C.Cir.1994) (“Indeed, the pedestrian nature of those interests affirmed as substantial calls into question whether any governmental interest — except those already found trivial by the Court — could fail to be substantial.”); Board of Trustees v. Fox, 492 U.S. 469, 475, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (finding a ban applied to “Tupperware parties” in a college dormitory to be permissibly based on the state’s substantial interests in “promoting an educational rather than commercial atmosphere on SUNY’s campuses, promoting safety and security, preventing commercial exploitation of students, and preserving residential tranquility”). But here we think several aspects of the government’s interest in country-of-origin labeling for food combine to make the interest substantial: the context and long history of country-of-origin disclosures to enable consumers to choose American-made products; the demonstrated consumer interest in extending country-of-origin labeling to food products; and the individual health concerns and market impacts that can arise in the event of a food-borne illness outbreak. Because the interest motivating the 2013 rule is a substantial one, we need not decide whether a lesser interest could suffice under Zauderer.
Country-of-origin information has an historical pedigree that lifts it well above “idle curiosity.” History can be telling. In Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion), for example, the Court, applying strict scrutiny to rules banning electioneering within a 100-foot zone around polling places, found an adequate justification in a “long history, a substantial consensus, and simple common sense.” See also Fla. Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (citing Burson for the same proposition). And country-of-origin label mandates indeed have a “long history.” Congress has been imposing similar mandates since 1890, giving such rules a run just short of 125 years. See Tariff Act of 1890, ch. 1244, § 6, 26 Stat. 567, 613; United States v. Ury, 106 F.2d 28, 29 (2d Cir.1939); see also Tariff Act of 1930, ch. 497, § 304, 46 Stat. 590, 687 (current version at 19 U.S.C. § 1304); Wool Products Labeling Act of 1939, as amended by Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, §§ 304-05, 98 Stat. 1585, 1604 (current version at 15 U.S.C. § 68b(a)(2)(D)); Fur Products La *24 beling Act, ch. 298, § 4, 65 Stat. 175, 177-78 (1951) (current version at 15 U.S.C. § 69b(2)(F)); Textile Fiber Products Identification Act, Pub.L. No. 85-897, § 4, 72 Stat. 1717, 1719 (1958) (current version at 15 U.S.C. § 70b(b)(4)-(5)); American Automobile Labeling Act, Pub.L. No. 102-388, § 210, 106 Stat. 1556 (1992) (current version at 49 U.S.C. § 32304).
The history relied on in Burson was (as here) purely of legislative action, not First Amendment rulings by the judiciary. But just as in Burson, where “[t]he majority of [the] laws were adopted originally in the 1890s,” 504 U.S. at 208, 112 S.Ct. 1846, the “time-tested consensus” that consumers want to know the geographical origin of potential purchases has material weight in and of itself, id. at 206, 112 S.Ct. 1846. The Congress that extended country-of-origin mandates to food did so against a historical backdrop that has made the value of this particular product information to consumers a matter of common sense.
Supporting members of Congress identified the statute’s purpose as enabling customers to make informed choices based on characteristics of the products they wished to purchase, including United States supervision of the entire production process for health and hygiene. 148 Cong. Rec. 5491-92 (2002) (statement of Rep. Hooley, co-sponsor of country-of-origin amendment to 2002 Farm Bill) (mentioning “buy American” and safety interests motivating consumers’ desire for country-of-origin information); id. at 5493 (statement of Rep. Wu) (same); see also 153 Cong. Rec. 20,-847 (2007) (statement of Rep. Bono) (calling country-of-origin labeling “a matter of public safety”). Some expressed a belief that with information about meat’s national origin, many would choose American meat on the basis of a belief that it would in truth be better. See, e.g., 148 Cong. Rec. 5492 (2002) (statement of Rep. Hooley); id. (statement of Rep. Thune); id. (statement of Rep. Wu). Even though the production steps abroad for food imported into the United States are to a degree subject to U.S. government monitoring, see Brief for United Mexican States as Amicus Curiae at 4-6, it seems reasonable for Congress to anticipate that many consumers may prefer food that had been continuously under a particular government’s direct scrutiny.
■ Some legislators also expressed the belief that people would have a special concern about the geographical origins of what they eat. This is manifest in anecdotes appearing in the legislative record, such as the collapse of the cantaloupe market when some imported cantaloupes proved to be contaminated and consumers were unable to determine whether the melons on the shelves had come from that country. See 148 Cong. Rec. 5492 (2002) (statement of Rep. Thurman). Of course the anecdote more broadly suggests the utility of these disclosures in the event of any disease outbreak known to have a specific country of origin, foreign or domestic.
The record is further bolstered by surveys AMS reviewed, such as one indicating that 71-73 percent of consumers would be willing to pay for country-of-origin information about their food. Mandatory Country of Origin Labeling, 68 Fed.Reg. 61,944, 61,955/2 (proposed Oct. 30, 2003) (to be codified at 7 C.F.R. pt. 60) (“2003 proposed rule”); see also 2013 rule, 78 Fed.Reg. at 31,375/3 (noting that commen-ters had referred to a study showing consumer willingness to pay). The AMS quite properly noted the vulnerabilities in such data. Most obvious is the point that consumers tend to overstate their willingness to pay; after all, the data sound possibly useful, and giving a “Yes” answer on the survey doesn’t cost a nickel.2003 proposed rule, 68 Fed.Reg. at 61,955/3; see also *25 2013 rule, 78 Fed.Reg. at 31,377/3 (reiterating that the agency found no available consumer surveys using sufficiently complex modeling techniques). But such studies, combined with the many favorable comments the agency received during all of its rulemakings, reinforce the historical basis for treating such information as valuable.2013 rule, 78 Fed.Reg. at 31,376/1-2.
In light of the legislators’ arguments, read in the context of country-of-origin labeling’s long history, we need not consider to what extent a mandate reviewed under Zauderer can rest on “other suppositions,” as opposed to “the precise interests put forward by the State.” See Edenfield v. Fane, 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The statute itself mandates country-of-origin labels, 2013 rule, 78 Fed.Reg. at 31,377/2, and AMI makes no claim that the agency’s exercises of its discretion are of constitutional moment (and we are reviewing only AMI’s constitutional claim, not the separate statutory interpretation issue it raised before the panel). As “[t]he Chenery doctrine [SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ] has no application to” agency actions required by statute, Morgan Stanley Capital Group Inc. v. Public Utility Dist. No. 1, 554 U.S. 527, 544-45, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008), the “precise interests” served by the 2013 rule are simply those advanced by Congress in adopting the statute.
We pause to note the implications of a rule under which a statute’s constitutionality could be doomed by agency fumbling (whether deliberate or accidental) of perfectly adequate legislative interests properly stated by congressional proponents. Such a rule would allow the executive to torpedo otherwise valid legislation simply by failing to cite to the court the interests on which Congress relied. And it would allow the next administration to revive the legislation by citing those interests. We do not think the constitutionality of a statute should bobble up and down at an administration’s discretion.
In any event, the agency has sufficiently invoked the interests served by the statute, both during the rulemaking, 2013 rule, 78 Fed.Reg. at 31,377/2 (“This rule ... is the result of statutory obligations to implement the [country-of-origin] provisions of the 2002 and 2008 Farm Bills.”); id. at 31,370/1, and in litigation, Federal Appel-lees’ Br. 25, 26, American Meat Institute v. USDA No. 13-5281 (D.C.Cir.2014), and has certainly not disclaimed those interests, see Oral Argument Tr. 51-52, American Meat Institute v. USDA No. 13-5281 (D.C.Cir. May 19, 2014) (en banc).
Finally, agency statements (from prior rulemakings) claiming that country-of-origin labeling serves no food safety interest are not inconsistent with any of the government’s litigation positions here. Simply because the agency believes it has other, superior means to protect food safety doesn’t delegitimize a congressional decision to empower consumers to take possible country-specific differences in safety practices into account. Nor does such an agency belief undercut the economy-wide benefits of confining the market impact of a disease outbreak.
Having determined that the interest served by the disclosure mandate is adequate, what remains is to assess the relationship between the government’s identified means and its chosen ends. Under Central Hudson, we would determine whether “the regulatory technique [is] in proportion to [the] interest,” an inquiry comprised of assessing whether the chosen means “directly advance[s] the state interest involved” and whether it is narrowly tailored to serve that end. Central Hudson, 447 U.S. at 564, 100 S.Ct. 2343; Fox, 492 U.S. at 480, 109 S.Ct. 3028. Zauderer ’s method of evaluating fit differs in *26 wording, though perhaps not significantly in substance, at least on these facts.
When the Supreme Court has analyzed Central Hudson’s “directly advance” requirement, it has commonly required evidence of a measure’s effectiveness. See Edenfield, 507 U.S. at 770-71, 113 S.Ct. 1792. But as the Court recognized in Zau-derer, such evidentiary parsing is hardly necessary when the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait, assuming of course that the reason for informing consumers qualifies as an adequate interest. 471 U.S. at 650, 105 S.Ct. 2265; see also Milavetz, 559 U.S. at 249, 130 S.Ct. 1324 (referring to Zau-derer as providing for “less exacting scrutiny”). Zauderer, like the doctrine of res ipsa loquitur, identifies specific circumstances where a party carries part of its evidentiary burden in a way different from the customary one. See, e.g., Bell v. May Dep’t Stores Co., 866 F.2d 452, 455-56 (D.C.Cir.1989). There, a plaintiff proves negligence by meeting the specified criteria (such as proving the defendant’s exclusive control over the agency causing the injury); here, by acting only through a reasonably crafted disclosure mandate, the government meets its burden of showing that the mandate advances its interest in making the “purely factual and uncontroversial information” accessible to the recipients. Of course to match Zauderer logically, the disclosure mandated must relate to the good or service offered by the regulated party, a link that in Zauderer itself was inherent in the facts, as the disclosure mandate necessarily related to such goods or services. See Zauderer, 471 U.S. at 651, 105 S.Ct. 2265 (acknowledging that the disclosure mandate involved “purely factual and uncontroversial information about the terms under which [the] services will be available”). For purposes of this case, we need not decide on the precise scope or character of that relationship.
The self-evident tendency of a disclosure mandate to assure that recipients get the mandated information may in part explain why, where that is the goal, many such mandates have persisted for decades without anyone questioning their constitutionality. In this long-lived group have been not only country-of-origin labels but also many other routine disclosure mandates about product attributes, including, for instance, disclosures of fiber content, 16 C.F.R. pt. 303, care instructions for clothing items, 16 C.F.R. pt. 423, and listing of ingredients, 21 C.F.R. § 101.4.
Notwithstanding the reference to “narrow tailoring,” the Court has made clear that the government’s burden on the final Central Hudson factor is to show a “reasonable fit,” see Fox, 492 U.S. at 480, 109 S.Ct. 3028, or a “reasonable proportion,” see Edenfield, 507 U.S. at 767, 113 S.Ct. 1792, between means and ends. To the extent that the government’s interest is in assuring that consumers receive particular information (as it plainly is when mandating disclosures that correct deception), the means-end fit is self-evidently satisfied when the government acts only through a reasonably crafted mandate to disclose “purely factual and uncontroversial information” about attributes of the product or service being offered. In other words, this particular method of achieving a government interest will almost always demonstrate a reasonable means-ends relationship, absent a showing that the disclosure is “unduly burdensome” in a way that “chill[s] protected commercial speech,” id. at 651, 105 S.Ct. 2265.
Thus, to the extent that the pre-condi-tions to application of Zauderer warrant inferences that the mandate will “directly advance” the government’s interest and show a “reasonable fit” between means *27 and ends, one could think of Zauderer largely as “an application of Central Hudson, where several of Central Hudson’s elements have already been established.” AMI Supplemental Br. at 9.
In this case, the criteria triggering the application of Zauderer are either unchallenged or substantially unchallenged. The decision requires the disclosures to be of “purely factual and uneontroversial information” about the good or service being offered. Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. AMI does not contest that eountry-of-origin labeling qualifies as factual, and the facts conveyed are directly informative of intrinsic characteristics of the product AMI is selling.
As to whether it is “controversial,” AMI objected to the word “slaughter” in its reply brief. Though it seems a plain, blunt word for a plain, blunt action, we can understand a claim that “slaughter,” used on a product of any origin, might convey a certain innuendo. But we need not address such a claim because the 2013 rule allows retailers to use the term “harvested” instead, 78 Fed.Reg. at 31,368/2, and AMI has posed no objection to that. And AMI does not disagree with the truth of the facts required to be disclosed, so there is no claim that they are controversial in that sense.
We also do not understand country-of-origin labeling to be controversial in the sense that it communicates a message that is controversial for some reason other than dispute about simple factual accuracy. Cf. Nat’l Ass’n of Mfrs. v. SEC, 748 F.3d at 371 (questioning but not deciding whether the information mandated was factual and uneontroversial). Leaving aside the possibility that some required factual disclosures could be so one-sided or incomplete that they would not qualify as “factual and uneontroversial,” cf. Nat’l Ass’n of Mfrs. v. NLRB, 717 F.3d at 958 (describing one party’s argument that disclosures were “one-sided ... favoring unionization”), country-of-origin facts are not of that type. AMI does not suggest anything controversial about the message that its members are required to express.
Nor does the mandate run afoul of the Court’s warning that Zauderer does not leave the state “free to require corporations to carry the messages of third parties, where the messages themselves are biased against or are expressly contrary to the corporation’s views.” Pacific Gas & Electric Co. v. Public Utilities Commission, 475 U.S. 1, 15-16 n. 12, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion).
Finally, though it may be obvious, we note that Zauderer cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech, as in Ibanez v. Florida Department of Business and Professional Regulation, 512 U.S. 136, 146-47, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994), where a required disclaimer was so detailed that it “effectively rule[d] out notation of the ‘specialist’ designation on a business card or letterhead, or in a yellow pages listing!” Nor can it sustain mandates that “chill[] protected commercial speech.” Zauderer, 471 U.S. at 651, 105 S.Ct. 2265. AMI has made no claim of either of these consequences.
Accordingly we answer affirmatively the general question of whether “government interests in addition to correcting deception,” American Meat Inst. v. USDA, 746 F.3d 1065, 1073 n. 1 (D.C.Cir.2014), can be invoked to sustain a disclosure mandate under Zauderer, and specifically find the interests invoked here to be sufficient. We reinstate the judgment and leave untouched the opinion of the panel with respect to the remaining issues on appeal.

So ordered.

. Judge Henderson in her separate dissent criticizes the now-vacated panel opinion for stating the panel's view that the language of RJ. Reynolds and National Association of Manufacturers v. NLRB limiting Zauderer to instances of deception-correction did not constitute holdings. Whatever the merits of that view, the panel recognized that other judges might reasonably take the contrary view and accordingly called for the court to consider the scope of Zauderer en banc, a call to which the court responded affirmatively. The present opinion is the consequence.