# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 28, 2020         Decided August 7, 2020

No. 19-5176

UNITED STATES HOUSE OF REPRESENTATIVES,
APPELLANT

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,
APPELLEES

———

On Rehearing En Banc

———

Before: SRINIVASAN, *Chief Judge*, HENDERSON**,
ROGERS, TATEL, GARLAND, GRIFFITH**, MILLETT, PILLARD,
WILKINS, KATSAS* and RAO*, *Circuit Judges*.

## **O R D E R**

On March 13, 2020, a majority of the judges eligible to participate voted to rehear this case en banc together with *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, No. 19-5331, to consider the "common issue of Article III standing presented" in both cases. *See* Order at 1, *U.S. House of Representatives v. Mnuchin*, No. 19-5176 (D.C. Cir. Mar. 13, 2020). The en banc court's decision in *McGahn* resolves that common issue by holding that there is no general

bar against the House of Representatives' standing in all cases involving purely interbranch disputes. *See Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, No. 19-5331 (D.C. Cir. Aug. 7, 2020) (en banc). Accordingly, it is

**ORDERED** that this case be remanded to the original panel for further consideration in light of *McGahn*. *See Al Bahlul v. United States*, 767 F.3d 1, 31 (D.C. Cir. 2014) (en banc) (remanding case to panel to consider outstanding questions); *United States v. McCoy*, 313 F.3d 561, 562 (D.C. Cir. 2002) (en banc) (same).

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Michael C. McGrail
Deputy Clerk

\* Circuit Judges Katsas and Rao did not participate in this matter.

\*\* A statement by Circuit Judge Henderson, with whom Circuit Judge Griffith joins, dissenting from the order remanding the case, is attached.

\*\* A statement by Circuit Judge Griffith, with whom Circuit Judge Henderson joins, dissenting from the order remanding the case, is attached.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, with whom *Circuit Judge* GRIFFITH joins, dissenting: After the Committee on the Judiciary of the United States House of Representatives timely petitioned for rehearing en banc in *McGahn*, the *Mnuchin* panel *sua sponte* asked the full court to take up that case as well to resolve "the common issue of Article III standing." Order at 1, *U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1228477 (D.C. Cir. Mar. 13, 2020). The court agreed to rehear both cases en banc, ordered supplemental briefing to address Article III standing and consolidated the cases for oral argument. Now, however, the court has determined that only one of the two warrants discussion, remanding *Mnuchin* to the panel for further consideration in light of *McGahn*. Because I would resolve the House's standing in *Mnuchin* as an en banc court, I dissent from the order remanding that case.

En banc rehearing is "not favored," "rarely granted" and usually ordered only "to secure or maintain uniformity of decisions among the panels . . . or to decide questions of exceptional importance." *D.C. Circuit Handbook of Practice and Internal Procedures* 58 (2019). As an initial matter, it is not obvious that rehearing *Mnuchin* was necessary to achieve uniformity. The *Mnuchin* panel had not issued an opinion before *sua sponte* seeking rehearing en banc and, in line with our precedent, could have simply "elect[ed] to withhold its decision until the en banc court decide[d] the potentially dispositive question" in *McGahn*. *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 374 (D.C. Cir. 2014) (Srinivasan, J., concurring in part) (providing examples), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). Nevertheless, once the en banc court agreed to rehear the Article III issue in *Mnuchin*, we committed, I thought, to fully resolve the exceptionally important questions of legislative standing therein. By reserving these matters for the panel to consider in the first instance, the remand order

disserves the parties' expectations and makes poor use of scarce judicial resources.

First, the parties do not appear to have shared the circumscribed view that the Article III standing question before the en banc court concerned only whether interbranch suits are generally barred. Both the House of Representatives and the Department of Justice briefed the court on matters relevant to whether *Mnuchin* could be resolved on narrower grounds, *see, e.g.*, Appellant's Supp. Br. 13; Appellee's Supp. Br. 5, and we provided no notice that such important questions would remain unanswered after consideration by the en banc court. On the contrary, the precedent cited in the order granting rehearing en banc belies this outcome, *see Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006) (en banc) (two appeals heard together en banc and decided in a consolidated opinion); *United States v. Crowder*, 87 F.3d 1405 (D.C. Cir. 1996) (en banc) (same), *cert. granted, judgment vacated*, 519 U.S. 1087 (1997), and the remand order's post hoc explanation falls short. In *United States v. McCoy*, 313 F.3d 561, 567 (D.C. Cir. 2002) (en banc), we remanded the merits question to the panel, rather than to the district court, in order "to consume fewer judicial resources." But, as highlighted below, remanding has the opposite effect here. And in *Al Bahlul v. United States*, 767 F.3d 1, 31 (D.C. Cir. 2014) (en banc), the appellant raised four challenges that "[w]e intended neither the *en banc* briefing nor argument to address" and "with the exception of a few passages . . . , we received none from the parties." Remand was therefore necessary to dispose of the outstanding issues but, here, we asked for and conducted a thorough airing of the House's *Mnuchin* standing. The majority points to no case—nor am I aware of any—in which we *sua sponte* consolidated two appeals for en banc rehearing and then addressed only one of them in the resulting opinion.

Second, although the remand is functionally equivalent to holding *Mnuchin* in abeyance pending the resolution of *McGahn*, that does not mean our procedural maneuverings can be written off as "no harm, no foul." To do so would overlook "the time and energy required of this court every time it gathers en banc," Order Denying Rehearing En Banc, *Edison Pharm. Co. v. FDA*, 517 F.2d 164, 165 (D.C. Cir. 1975) (statement by Leventhal, J.), a concern that is especially pertinent given the constraints imposed by the current pandemic. After two sets of briefing, two merits arguments and months of consideration, there is no reason that the parties should continue to languish without a definitive answer from this court. I see no benefit in prolonging the disposition of this important case and, accordingly, I respectfully dissent.

GRIFFITH, *Circuit Judge*, with whom *Circuit Judge* HENDERSON joins, dissenting: Today the en banc court issues an order remanding this case to the three-judge panel without deciding the sole issue we agreed to resolve: whether the House of Representatives has Article III standing to sue the Executive Branch for violating the Appropriations Clause. The parties have been litigating this case for well over a year, and the court's remand of the matter to the panel will likely delay final judgment for at least that long again. Such delay not only deprives the parties of timely resolution of this dispute, but it leaves this circuit's law on congressional standing uncertain. That confusion invites Congress to continue to litigate its political disputes with the Executive Branch—to the detriment of both Congress and the Judiciary.

This is not a hard case. Even under the return to the discredited view of legislative standing that the court adopts today in *McGahn*, the House still lacks Article III standing to sue to enforce the Appropriations Clause. At bottom, the House's lawsuit is indistinguishable from a claim that the Executive Branch has failed to follow the law—a "generalized grievance[]" that cannot confer Article III standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984). What's more, the House alone cannot sue to protect Congress's interest in enforcing the Appropriations Clause, as the Supreme Court made clear in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953-54 (2019). The House's lawsuit must be dismissed.

I

On February 14, 2019, after the longest-ever partial shutdown of the federal government, Congress passed the Consolidated Appropriations Act of 2019, Pub. L. No. 116-6, 133 Stat. 13, which appropriated $1.375 billion for construction of a wall along the border with Mexico. That amount was several billion dollars less than the President sought. The same day the President signed the bill, the

Administration announced that it had "identified up to $8.1 billion" in appropriated funds from other congressional statutes to build the wall. *President Donald J. Trump's Border Security Victory*, White House (Feb. 15, 2019), J.A. 151.

On April 5, 2019, the House filed suit in federal district court, alleging that the Administration "flouted fundamental separation-of-powers principles and usurped for itself the legislative power specifically vested by the Constitution in Congress." Compl. at 2, J.A. 19. According to the House, the appropriations statutes invoked by the Administration "d[id] not authorize" the Executive Branch to expend funds "to construct a wall along the southern border." *Id.* ¶ 103, J.A. 58. The House claimed that this unauthorized spending violated the Administrative Procedure Act and the Appropriations Clause. *Id.* ¶¶ 89-120, J.A. 56-60. The district court denied the House's motion for a preliminary injunction, concluding that the House lacked standing. *See U.S. House of Representatives v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019).

The House timely appealed, and the matter was fully briefed and then argued before a three-judge panel on February 18, 2020. On February 28, our circuit decided *Committee on the Judiciary v. McGahn*, 951 F.3d 510 (D.C. Cir. 2020) (*McGahn I*), *reh'g en banc granted sub nom. U.S. House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1228477 (D.C. Cir. Mar. 13, 2020) [hereinafter *Mnuchin* Order]. In *McGahn I*, a divided panel held that the Judiciary Committee's suit to enforce a congressional subpoena against the Executive Branch did "not present an Article III case or controversy." *Id.* at 531.

After the Committee filed a petition for rehearing en banc, "the panel [in *Mnuchin*] requested a vote of the en banc court to determine whether to rehear *Mnuchin* en banc in light of the

common issue of Article III standing presented in that case and *McGahn*." *Mnuchin* Order at 1. A majority of eligible judges voted to rehear both cases en banc. *Id.* at 2. We then ordered the parties to file supplemental briefs in each case, and we heard nearly four hours of oral argument in the two cases. In the *McGahn* appeal, which is decided today, the en banc court concludes that the Committee has Article III standing to enforce its subpoena against McGahn. *See Comm. on the Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. Aug. 7, 2020) (en banc). But the court declines to resolve the similar question presented here. Instead, it remands this case to the original three-judge panel to resolve that issue in the first instance.

II

I cannot agree with the court's refusal to decide this case. When the court granted rehearing, it necessarily determined that a "question of exceptional importance"—*i.e.*, whether the House has Article III standing to enforce the Appropriations Clause against the Executive Branch—justified the full court's attention. FED. R. APP. P. 35(a)(2). Indeed, that question seemed so exceptional that, acting on its own initiative, the court voted to rehear the case *before* the three-judge panel had issued an opinion. Rehearing en banc should be rare; *sua sponte* rehearing even more so. Piling exception upon exception, the full court now departs from regular order by sending the case back to the panel without answering the "question of exceptional importance" that triggered rehearing in the first place.

What accounts for this extraordinary departure? The court offers no explanation for this unusual move, and I can think of none. We have more than enough information to resolve the issue—a thorough district court opinion, three rounds of briefing from the parties, a lengthy oral argument, and access

to the U.S. Reports. The House and the Department of Justice have provided the "vigorous prosecution and [the] vigorous defense of the issues" that "[s]ound judicial decisionmaking requires." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 572 (1993) (Souter, J., concurring in part and concurring in the judgment) (internal quotation marks omitted). At the very least, we owe the parties an explanation of *why* we've deprived them of timely resolution of their dispute.

Resolving *Mnuchin* and *McGahn* together, which I thought was the reason for hearing both cases en banc, makes good sense. Both ask whether or when the Legislative Branch may invoke the jurisdiction of the federal courts in a dispute with the Executive Branch. By declining to resolve *Mnuchin* today, the court leaves the limits of its newly revived theory of congressional standing in *McGahn* undefined. That decision not only robs Congress of a timely answer in this case, but also leaves both Congress and the Executive Branch guessing about how future litigation between the branches might play out, inviting them to file further suits. Sometimes, "it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting). I would not keep our coordinate branches waiting for an answer to this "question of exceptional importance."

### III

The question is easily answered. Even if a chamber of Congress has Article III standing to enforce a legislative subpoena against the Executive Branch (as the court wrongly holds in *McGahn*), the House lacks standing to enforce the Appropriations Clause for two further reasons. First, the Supreme Court has repeatedly held that a "generalized

grievance" about the Executive Branch's failure to comply with the law cannot be an Article III injury, and the House's complaint reduces to an argument that the Administration lacks statutory authority to spend money. Second, even setting aside the generalized-grievance issue, a single chamber of Congress cannot assert an injury to Congress as a whole. By its own terms, the Appropriations Clause vests power in the House and Senate—acting together through bicameralism and presentment—to control appropriations. At the very least, the House alone cannot invoke the court's jurisdiction to vindicate the full Congress's interest in the appropriations process.

## A

### 1

The irredeemable flaw in the House's suit is that it alleges only a "generalized grievance" that the Executive Branch has failed to comply with the law, and that sort of grievance cannot confer Article III standing.

The House "maintains that the Administration violated the Appropriations Clause by ignoring the House's decision to limit fiscal year 2019 spending on border-wall construction to $1.375 billion." House Suppl. Br. 10. Though the House frames its claim as an "Appropriations Clause violation," its argument is indistinguishable from a claim that the Executive Branch has exceeded its statutory authority. The Appropriations Clause demands that "the payment of money . . . must be authorized by a statute." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). This is no different from any other action by the Executive Branch that is not authorized by the Constitution itself. The House's grievance here thus collapses into an argument that the Administration's spending on the border wall lacks statutory authorization, as the terms of the House's

complaint confirm. *E.g.*, Compl. ¶ 59, J.A. 44 ("But defendants cannot satisfy the *statutory requirements for transferring and expending funds . . . .*" (emphasis added)); *id.* ¶ 92, J.A. 56 (similar); *id.* ¶ 103, J.A. 58 (similar).

Over and over and over again, the Supreme Court has reaffirmed that an "injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992); *see also, e.g.*, *FEC v. Akins*, 524 U.S. 11, 23-24 (1998); *Whitmore v. Arkansas*, 495 U.S. 149, 160 (1990); *Allen*, 468 U.S. at 751; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 219-20 (1974); *United States v. Richardson*, 418 U.S. 166, 176-78 (1974); *Massachusetts v. Mellon*, 262 U.S. 447, 488-89 (1923); *Fairchild v. Hughes*, 258 U.S. 126, 129-130 (1922). That fundamental principle imbues standing doctrine's injury-in-fact prong with the "separation-of-powers significance" that the Court has "always said" it must have. *Lujan*, 504 U.S. at 577. As the Court has explained, "Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Id.* at 576 (emphasis omitted). If the "undifferentiated public interest in executive officers' compliance with the law" were "vindicable in the courts," then unelected judges would effectively perform "the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Id.* at 577 (quoting U.S. CONST. art. II, § 3).

Congressional plaintiffs must not be allowed to circumvent this cardinal feature of the separation of powers. *Cf. Barnes v. Kline*, 759 F.2d 21, 49-50 (D.C. Cir. 1984) (Bork, J., dissenting) ("It is well settled that citizens . . . would have no standing to maintain this action. That being so, it is impossible

that these representatives should have standing that their constituents lack." (footnote omitted)), *vacated sub nom. Burke v. Barnes*, 479 U.S. 361 (1987). Article III prevents courts from "assum[ing] a position of authority over the governmental acts of another and co-equal department," whether at a private citizen's behest or at Congress's. *Lujan*, 504 U.S. at 577 (internal quotation marks omitted). Indeed, substituting the House for a private citizen doesn't alleviate the separation-of-powers problems; it compounds them. The Judiciary isn't Congress's watchdog, and Congress may not enlist us to "monitor[] . . . the wisdom and soundness of Executive action." *Id.* (internal quotation marks omitted). In *Raines v. Byrd*, the Court declared it "obvious[]" that the Judiciary lacks the power to engage in some "amorphous general supervision of the operations of government." 521 U.S. 811, 828-29 (1997) (internal quotation marks omitted). Allowing the House to dress up a generalized grievance as an "institutional injury" would force the federal courts into a role that the Supreme Court has repeatedly and emphatically refused to accept.

The House rightly reminds us that the Executive Branch is not above the law. But neither is the Judiciary. The Constitution—"the supreme Law of the Land," U.S. CONST. art. VI, cl. 2—confines each of the three branches to its proper sphere. Article III empowers the federal courts to resolve "Cases" and "Controversies," not generalized disputes about the "operations of government." *Raines*, 521 U.S. at 829 (internal quotation marks omitted). And the law of Article III standing constrains courts to policing the Executive Branch *only* when necessary "to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). Indeed, as this case languishes in our circuit, other federal judges have been doing just that—evaluating some of the very same spending decisions in suits

that allege actual injury to private citizens. *See Sierra Club v. Trump*, 963 F.3d 874, 884 (9th Cir. 2020) (noting that the border wall could injure the recreational and aesthetic interests of thousands of people); *see also id.* at 902-03 (Collins, J., dissenting) (agreeing that the plaintiffs have standing).

I express no view on the reasoning in that decision, but it illustrates the *type* of case in which a federal court may consider whether the Executive Branch has violated the law: a case that implicates the "rights and liberties of individual citizens [or] minority groups against oppressive or discriminatory government action." *Raines*, 521 U.S. at 829 (internal quotation marks omitted). Unless a party comes to court alleging *that* sort of an injury, we have "no charter to review and revise . . . executive action." *Summers*, 555 U.S. at 492; *see also McGahn I*, 951 F.3d at 516-17.

2

The House has no persuasive counterarguments. The House concedes that a suit alleging that the President violated a statute would "never or virtually never" be justiciable. Oral Arg. Tr. 103:24. When a litigant brings a suit that is conceptually indistinguishable from one that the litigant concedes "never or virtually never" belongs in court, we should dismiss that case.

Nevertheless, the House seeks to distinguish this case by casting it as a suit to enforce the *Constitution itself*—and thus more than an effort to stop the Executive Branch from exceeding its statutory authority. *But see, e.g.*, Compl. ¶ 59, J.A. 44 (alleging that the Executive Branch "cannot satisfy the statutory requirements for transferring and expending funds"); *id.* ¶ 92, J.A. 56 (similar); *id.* ¶ 103, J.A. 58 (similar); *id.* ¶ 114, J.A. 59 (similar). At oral argument, we probed the limits of the

House's theory. Could Congress or the House sue to enforce the Declare War Clause? The Bicameralism and Presentment Clause? Counsel repeatedly declined to give definitive answers, *e.g.*, Oral Arg. Tr. 99:17-18 ("And I just don't feel able to answer your question with a definitive yes-no."), but insisted that "the Appropriations Clause [is] different from almost every other [Clause] in the Constitution," *id.* at 99:20-21.

Why? The House says that a harm to Congress's appropriations power is concrete because the Appropriations Clause "operates as an express textual *prohibition* on Executive Branch spending absent authorization by each House of Congress." House Suppl. Br. 5; *see also* Oral Arg. Tr. 99:10-15. That distinction won't work. It is not enough that the Clause imposes a "prohibition" on spending, because the Constitution imposes other "prohibitions" on the Executive Branch too. Unless given authority to do so by the Constitution, the Executive Branch "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). *That* prohibition on Executive Branch action without congressional authorization is just as fundamental as the Appropriations Clause's prohibition on spending without authorization.

The House also emphasized the text of the Appropriations Clause—specifically, that the Clause is an express limitation on the Executive Branch's conduct. *See* U.S. CONST. art. I, § 9, cl. 7 ("*No Money shall* be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." (emphasis added)). But that distinction cannot matter either, for it would

craft a rule both too narrow and too broad. Too narrow because it fails to justify the Committee's standing to sue in *McGahn*, which involves an injury to the House's *implied* power "to conduct investigations or issue subpoenas." *Trump v. Mazars USA, LLP*, No. 19-715, slip op. at 11 (U.S. July 9, 2020). Too broad because it would authorize Congress to sue under the similarly worded Port Preferences Clause, Titles of Nobility Clause, and Emoluments Clause—suits which the House seems to concede it cannot bring. *See, e.g.*, Oral Arg. Tr. 108:14-17; *id.* at 109:20-24.

When pressed at argument, the House eventually abandoned its "express textual prohibition" distinction and settled on arguing that the Appropriations Clause was "unique" because of "a combination of . . . various factors," including "text," "history," and the "absence of any corollary power under Article 2." *Id.* at 110:1-19. In other words, it just so happens that the *only* Clause in the Constitution that gives the House standing is this one. That is not a theory of the case. It is a doctrinal gerrymander.

B

Even were the House to discover a better explanation for its contention that the Appropriations Clause is different from the rest of the Constitution, it would not matter in *this* case because the House's claim has yet another fatal flaw. There is a "mismatch between the body seeking to litigate and the body to which the relevant constitutional provision" assigns the institutional interest that the asserted injury impairs. *Bethune-Hill*, 139 S. Ct. at 1953.

In *Bethune-Hill*, the Supreme Court considered whether the Virginia House of Delegates—a single chamber of Virginia's bicameral legislature, the General Assembly—had

standing to appeal the invalidation of a redistricting plan drawn by the General Assembly. The House of Delegates argued that it had standing as "the legislative body that actually drew the redistricting plan." *Id.* at 1952-53 (internal quotation marks omitted). But the Virginia Constitution stated that "members of the Senate and of the House of Delegates of the General Assembly shall be elected from electoral districts *established by the General Assembly.*" *Id.* at 1953 (emphasis added) (quoting VA. CONST. art. 2, § 6). The Court concluded that this language "allocate[d] redistricting authority to the 'General Assembly,' of which the House constitute[d] only a part." *Id.* And because "a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole," the Supreme Court dismissed the case for want of standing. *Id.* at 1953-54.

*Bethune-Hill* squarely controls. The Appropriations Clause says: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made *by Law . . . .*" U.S. CONST. art. I, § 9, cl. 7 (emphasis added). That use of "by Law" references the Bicameralism and Presentment Clause, *see* U.S. CONST. art. I, § 7, cl. 2, which mandates that "no law [can] take effect without the concurrence of the prescribed majority of the Members of both Houses," *INS v. Chadha*, 462 U.S. 919, 948 (1983). Like the Virginia constitutional provision in *Bethune-Hill*, the Appropriations Clause assigns a prerogative to the bicameral body: Congress.

Other constitutional provisions confirm that conclusion. When the Framers sought to grant a unicameral power, they did so explicitly. For instance, Article I, Section 5 states that "*[e]ach House* shall be the Judge of the Elections, Returns and Qualifications of its own Members," and that "*[e]ach House* may determine the Rules of its Proceedings." U.S. CONST. art. I, § 5, cls. 1, 2. Likewise, the Constitution vests certain

unicameral prerogatives in the House alone, *see id.* art I, § 2, cl. 5 ("The House of Representatives . . . shall have the sole Power of Impeachment."), and others in the Senate alone, *see id.* art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments."); *id.* art. II, § 2, cl. 2 ("[The President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties . . . ."). The Appropriations Clause refers not to "each House," nor to the "House of Representatives," nor to "the Senate," but instead to Congress's collective capacity to make "Law[s]."

Without even engaging with the "by Law" requirement of the Clause, the House insists that there's no mismatch problem because the Clause vests "*each chamber* of Congress [with] a veto over both the Executive and each other with respect to federal spending." House Suppl. Br. 6. Quoting James Wilson, the House says that "the federal purse has 'two strings, one of which [is] in the hands of the H. of Reps.,' and '*[b]oth* houses must concur in untying' them." *Id.* (alterations in original) (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 275 (Max Farrand ed., 1911) (James Wilson)).

That vivid metaphor has almost no argumentative content. Undoubtedly, *both* chambers of Congress must agree to pass an appropriations act, and that institutional reality sometimes gives a single chamber—practically speaking—a "veto" over federal spending. But that is true of any piece of legislation that Congress wants to enact; indeed, it is a necessary feature of a bicameral legislature. If the House's practical "veto" argument suffices to convert a bicameral power into a unicameral one, *Bethune-Hill* has no force. There too, the Virginia House of Delegates had a veto over the State's redistricting plans. But that practical fact did not overcome the text, which vested a power in both houses of the Virginia legislature. Creative metaphors aside, *Bethune-Hill* compels the conclusion that the

House alone lacks a cognizable institutional interest in enforcing compliance with the Appropriations Clause.

## III

Anyone who thinks that the federal courts should mediate political disputes between the branches should watch this case wend its way through the courts. Recall that in April 2019 the House asked a district court to enjoin the Executive Branch from spending money to build a border wall. Well over a year later, the House is still waiting. Now the case goes back to the three-judge panel for another round of briefing and perhaps oral argument. That's another couple months of waiting. If the panel affirms the district court (as it should), the House might ask the Supreme Court to intervene. Wait a couple more months. If the panel reverses, the prospects for timely resolution are even worse. Assuming the Department of Justice petitions for certiorari, that's a few more months—whatever the Supreme Court does. And remember, even if the House has standing, on remand the district court will need to address whether it has a cause of action and whether it wins on the merits. More appeals will follow those rulings. Careful deliberation is a hallmark of the federal courts, but that virtue comes at price: we can take a long time. The reality is that if the House were to eventually prevail, it would not get its injunction for well over a year.

Courts are not suited to helping the branches resolve their differences. But in recent years, political actors seem to be bringing more and more of these interbranch disputes to federal court. As I've said, adjudicating these disputes risks giving the impression that we've joined the political fray. *See McGahn I*, 951 F.3d at 517-18. That impression—deserved or not—will erode public confidence in an institution that promises to "judge by neutral principles." Herbert Wechsler, *Toward*

*Neutral Principles of Constitutional Law*, 73 HARV. L. REV. 1, 16 (1959). And all that so the House can wait years for a court to *possibly* take its side against the Executive Branch?

I would put an end to all these lawsuits now. I would definitively hold that disputes between the Legislative and Executive Branches simply do not belong in the federal courts. Barring that, I would dispense with the set of interbranch disputes that arise out of bare disagreements about the scope of the Executive Branch's statutory authority. And barring that, I would dispense with those cases in which the House or Senate, by itself, seeks to assert the institutional interests of Congress as a whole. But I cannot agree to delay resolution of the case by remanding to the three-judge panel. That delay harms the parties, and the uncertainty leaves two co-equal branches guessing whether or when we will intervene in their political disputes. The very least we can do is resolve the question we agreed to answer, and I respectfully dissent from the order declining to do so.